UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| STEPHANOS KYRKANIDES, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 5:21-cv-00270-GFVT |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| ELI CAPILOUTO, *et al.*, | ) | **&** |
| | ) | **ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

For the third time in as many years, this Court is playing host to a civil action arising from a longstanding dispute within the University of Kentucky College of Dentistry.[1]  The case at hand arose from various University Administrators' treatment of Dr. Stephanos Kyrkanides, who previously served as Dean of the College.  He alleges the Administrators' actions constitute (1) direct First Amendment infringement, (2) First Amendment retaliation, (3) unconstitutional conditions, and (4) denial of due process in violation of the Fourteenth Amendment.  The Administrators move to dismiss his complaint in its entirety, alleging that "no plausible claim can be found in any of the 167 numbered paragraphs or eleven exhibits contained" therein.  [R. 4-1 at 2.]  President Capilouto also filed a separate Motion to Dismiss.  [R. 5.]  For the reasons stated below, the Court will **GRANT** President Capilouto's Motion and **GRANT IN PART** and **DENY IN PART** the other Administrators' Motion.

---

[1] *Cunningham v. Blackwell, et al.*, 3:20-cv-00008-GFVT (E.D. Ky. 2020); *Shehata v. Blackwell, et al.*, 3:20-cv-00012-GFVT (E.D. Ky. 2020).  *See also Mullins v. Kyrkanides*, 5:17-cv-00319-REW (E.D. Ky. 2018).

**I**

Dr. Stephanos Kyrkanides joined the faculty of the University of Kentucky College of Dentistry in 2015. [R. 1 at 9.] He states he was hired as an Orthodontics professor, while the Administrators state he was hired to be the Dean of the College. [*Id.*; R. 4-1 at 1.] Nevertheless, he was placed "involuntarily"—the Administrators add "after he failed [as Dean]"—on "sabbatical/administrative leave" in early 2019. [R. 1 at 10.] As his sabbatical was nearing its end, his supervisors, including Dr. Okeson, called a meeting to determine his Distribution of Effort (DOE) for the following year. *Id.*

During this meeting, he claims that his supervisors directed him "to engage in clinical instruction without a valid license." *Id.* at 11. Dr. Kyrkanides was concerned this could expose him to legal liability, so he asked the Kentucky Board of Dentistry if it would be appropriate for him to do so. *Id.* at 12. He alleges the Board informed him that such teaching would violate Kentucky law and asked him to file a formal report, which he did. *Id.* Further regarding Dr. Kyrkanides's clinical practice, he alleges he received conflicting directives regarding his clinical privileges after he returned from his sabbatical. *Id.* at 14. The Credentialing Committee granted him clinical privileges with the caveat that he had to be in the presence of another licensed attending physician. *Id.* However, his supervisor told him to begin independent clinical instruction. *Id.* In August of 2020, Dr. Kyrkanides reported this directive to the State Medicaid Office, Humana, and the Kentucky Board of Dentistry. *Id.* at 22.

Dr. Kyrkanides alleges that his first report to the Kentucky Board of Dentistry triggered his supervisors' "motivat[ion] to silence and punish Plaintiff for his exercise of free speech." *Id.* It appears the first example of such punishment occurred at an April 2020 College of Dentistry Zoom meeting. *Id.* at 15. Dr. Kyrkanides got permission to speak from Dr. Okeson and

presented financial information for the College that he had received pursuant to an open records request.  *Id.*  He claimed those records showed that the College was "at the brink of financial insolvency" due to "inefficiencies and waste of public funds" by the administration.  *Id.* at 16.  He alleges his speech was "interrupted multiple times by the Associate Dean for Finance and Administration" and that Dr. Okeson then muted Dr. Kyrkanides.  *Id.*  at 17.  He remained muted for the remainder of the meeting.  *Id.*

Dr. Kyrkanides again asked to be placed on the agenda of a College of Dentistry Division of Orthodontics Zoom meeting in January 2021.  *Id.* at 25.  He spoke about the directives regarding his clinical practice, his belief that he could have been subjected to liability if he complied, and shared information he obtained from his reports to the Medicaid Office, Humana, and the Kentucky Board of Dentistry.  *Id.* at 25-26.  Dr. Kyrkanides does not allege that this speech was interrupted at any point.  But after the meeting, Dr. Kluemper emailed Dr. Kyrkanides and stated he had been "disruptive, unprofessional, and inaccurate."  *Id.* at 26.  Drs. Kluemper and Okeson then "threatened Plaintiff with immediate expulsion from meetings."  *Id.* In response, Dr. Kyrkanides sent a number of emails to various individuals and groups within the College emphasizing his concerns.  *Id.* at 28-29.  Drs. Kluemper and Okeson then barred Dr. Kyrkanides from attending faculty meetings.  *Id.* at 29.  Dr. Kyrkanides asked Dr. Okeson if he could attend a meeting in early February 2021 and did not receive a response.

A handful of other incidents occurred over this time period which Dr. Kyrkanides alleges support his claims.  In June 2020, he discovered a "new unrecognizable box" in his office and called the police.  *Id.* at 20.  The police opened the box and found that it contained a knife.  *Id.* The knife and box were removed from his office.  *Id.* at 21.  A few days later, one of those

officers searched his office for weapons but did not find any.  *Id.*  He believes the knife and the search were further retaliation for his speech.  *Id.*

Further, Mr. Thro directed the Credentialing Committee to refrain from communicating with Dr. Kyrkanides in February 2021.  *Id.* at 31.  He claims that this action prevented him from "updat[ing] his credentialing status and engag[ing] in clinical activities."  *Id.*  Dr. Okeson conducted a performance evaluation of Dr. Kyrkanides in March, which concluded that he had not satisfied his assigned clinical duties.  *Id.* at 32.  He alleges this is only because he was unable to communicate with the Credentialing Committee.  *Id.*

Around this time, Dr. Kyrkanides contacted the University's Senate Advisory Committee on Privilege and Tenure about being barred from attending meetings.  *Id.*  The SACPT advised President Capilouto that the decision "raises, at least, serious concerns that a faculty member's academic privilege has been violated" and recommended that his ability to participate in meetings should be restored.  *Id.* at 33.  President Capilouto did not respond to or adopt that recommendation and Dr. Kyrkanides is still barred from participating in Department of Orthodontics meetings.  *Id.* at 34.

Ultimately, the Administrators characterize their actions as an attempt to "manage [Dr. Kyrkanides's disruptive and unprofessional behavior."  Dr. Kyrkanides characterizes them as violations of his constitutional rights.  He initiated this case alleging as such, and the Administrators now move to dismiss his complaint for failure to state a claim.  [R. 4; R. 5.]  Each of the motions has been fully briefed and is ripe for review.

## II

The Administrators argue that Dr. Kyrkanides has failed to state a plausible claim for relief and ask the Court to dismiss his complaint under Rule 12(b)(6).  [R. 4; R. 5.]  A motion to

dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a plaintiff's complaint.  In reviewing a Rule 12(b)(6) motion, the Court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all inferences in favor of the plaintiff." *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  The Court, however, "need not accept as true legal conclusions or unwarranted factual inference."  *Id.* (quoting *Gregory v. Shelby Cty.*, 220 F.3d 433, 446 (6th Cir. 2000)).

The Supreme Court has explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Courie v. Alcoa Wheel & Forged Products*, 577 F.3d 625, 629 (6th Cir. 2009).  Stated otherwise, it is not enough for a claim to be merely possible; it must also be "plausible."  *See Courie*, 577 F.3d at 630.  According to the Court, "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## A

The Administrators' first ground for dismissal is that many of the events alleged in Dr. Kyrkanides's complaint occurred outside of the statute of limitations.  All of his claims assert violations of 42 U.S.C. § 1983.  The statute of limitations for § 1983 actions is determined by the statute of limitations applicable to personal injury actions in the state in which the claim arose. *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634-35 (6th Cir. 2007).  In Kentucky, personal injury actions are subject to a one-year statute of limitations.  Ky. Rev. Stat. § 413.140(1).  The date the limitations period begins is a question of federal law.  *Eidson*, 510

F.3d at 634.  Ordinarily, this limitation begins when a plaintiff knows or has reason to know of the injury which provides the basis for his action.  *Id.*

Dr. Kyrkanides filed his complaint on October 23, 2021, so the Administrators argue that any claim based on an action taken before October 23, 2020 is time-barred.  [R. 4-1 at 8.]  They argue this would bar any claim arising from the following allegations:

1. The Defendants' conduct in the December 2019 meeting with Dr. Kyrkanides;
2. Dr. Okeson's email to Mr. Thro regarding the December 2019 meeting;
3. The February 2020 communication from University officials to Dr. Kyrkanides regarding the allegedly inappropriate directives he received;
4. The April 2020 Zoom meeting;
5. The incident regarding the knife found in Dr. Kyrkanides's office, and;
6. Mr. Thro's February 2019 email asking Dr. Kyrkanides to communicate with the University through his attorney.

*Id.*  They state the only timely allegations are that Drs. Okeson and Kluemper barred him from attending faculty meetings and President Capilouto's decision not to adopt the SACPT recommendation.  *Id.*

Dr. Kyrkanides stated that actions taken prior to October 23, 2020 were included in his complaint to provide "background information."  [R. 6-1 at 8.]  However, at least his First Amendment claim is based in part on conduct occurring before that date because it alleges that Dr. Okeson violated the First Amendment by muting him at the April 2020 meeting.  [R. 1 at 36.]  This raises a First Amendment claim that occurred months outside of the limitations period. Nevertheless, Dr. Kyrkanides agrees that "the statute of limitations has been clarified as the date of violation occurred subsequent to October 23, 2020."  [R. 6-1 at 8.]  On apparent agreement between the parties, the Administrators' Motions to Dismiss will be granted as to all claims arising from actions occurring before October 23, 2020.  The remaining allegedly infringing conduct is (1) Drs. Okeson and Kluemper's decision in January 2021 to bar Dr. Kyrkanides from

attending faculty meetings, (2) Mr. Thro's direction to the UK Credentialing Committee to refrain from communicating with Dr. Kyrkanides in February 2021, and (3) President Capilouto's decision not to adopt the SACPT's April 2021 recommendation that Dr. Kyrkanides's right to attend faculty meetings be restored.  [R. 1 at 26-35.]  Each of Dr. Kyrkanides's claims will be addressed in turn to the extent that they are based on timely allegations.[2]

**B**

The Administrators argue that Dr. Kyrkanides's First Amendment claim should be dismissed because he was not engaged in protected conduct and they are protected by qualified immunity.  [R. 4-1 at 8-17.]  Their argument in favor of dismissing Count I relies on the elements of a First Amendment retaliation claim (protected activity and government action likely to chill an ordinary person from engaging in that activity, motivated at least in part by the protected activity).  [R. 4-1 at 9 (citing *Nair v. Oakland Cty. Comm. Mental Health Auth.*, 443 F.3d 469, 478 (6th Cir. 2006)).]  However, Count I brings a pure First Amendment claim separate from Count II's claim for First Amendment retaliation.  [*Compare* R. 1 at 35-39 to R. 1 at 39-41.]  Those claims are distinct because retaliation against an individual for *exercising* their First Amendment rights is different than an action *preventing* or *interfering with* the exercise of First Amendment rights.  The Administrators' confusion regarding Count I is understandable given that it makes numerous references to retaliation.  [R. 1 at 36-38 ("plaintiff's speech was the only factor in motivating Defendant Okeson," "Plaintiff's speech was a substantial factor, if not the sole factor, in motivating Defendant Kluemper," "any alternative reasons . . . are pretextual," "the Defendants' motivation is to silence . . . and to retaliate against the Plaintiff for past

---

[2] President Capilouto's Motion to Dismiss is addressed in Part II.F, while the other Administrators' Motion is addressed in Parts II.B-E.

speech," *et cetera*).]  Though the complaint is inarticulately pled, dismissal is not warranted

merely "for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v.*

*City of Shelby*, 574 U.S. 10, 11 (2014).  A complaint survives dismissal if it "plead[s] facts

sufficient to show that [the] claim has substantive plausibility."  *Id.*  Because the Administrators'

argument applies to First Amendment retaliation, the Court will use it to consider whether Count

II should be dismissed.  Without an argument specific to Count I, the Court will dismiss it only

as to Mr. Thro because no allegation within Count I applies to him. [3]

C

Count II, Dr. Kyrkanides's claim for First Amendment retaliation, must show:

> '(1) that he was engaged in a constitutionally protected activity, (2) that the
> defendant's adverse action caused him to suffer an injury that would likely chill a
> person of ordinary firmness from continuing to engage in that activity; and (3)
> that the adverse action was motivated at least in part as a response to the exercise
> of his constitutional rights.'

*Nair*, 443 F.3d at 477-78 (quoting *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 715 (6th

Cir. 2001)).  The Administrators' primary argument in favor of dismissing Count II focuses on

the first element: whether Dr. Kyrkanides's speech was constitutionally protected.  [R. 4-1 at 8-

20.]  They also argue that the claim should be dismissed against Mr. Thro and that all of the

Defendants are protected by qualified immunity.  *Id.*

1

The first element of Count II—whether Dr. Kyrkanides was engaged in constitutionally

protected activity—is subject to another three-part test.  When a public employee is speaking at

---

[3] The Administrators argue that Count I does not bring a claim against Mr. Thro because he is not mentioned
anywhere within it.  [R. 1 at 35-39.]  The Court agrees because the only timely allegation regarding Mr. Thro—that
he directed the Credentialing Committee to not communicate with Dr. Kyrkanides—does not affect his First
Amendment rights and is not mentioned within Count I.  *Id.*  But because Count I refers to the Defendants generally,
the Court will dismiss it to the extent it was intended to bring a First Amendment claim against Mr. Thro.  *Id.*

their place of work, his speech is constitutionally protected if he is speaking as a private citizen, the speech involves a matter of public concern, and the employee's interest in that speech outweighs the government employer's interest in efficiently performing its services. *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).

### a

The Administrators first argue that Dr. Kyrkanides's speech was "as a governmental employee, not as a private citizen, [so] his speech is unprotected." [R. 4-1 at 11.] "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens," so their speech is unprotected. *Garcetti*, 547 U.S. at 421. The Sixth Circuit uses a number of factors to determine in which context a public employee is speaking, including the impetus, setting, audience, and subject matter of the speech. *Handy-Clay*, 695 F.3d at 540. The Administrators argue that Dr. Kyrkanides's speech was pursuant to his official duties because it occurred at an orthodontics faulty meeting which he was attending as an orthodontics professor and which was not open to the public. [R. 4-1 at 11.]

The Court finds that Dr. Kyrkanides stated a plausible claim that his speech was not made pursuant to his official duties. The speech for which Dr. Kyrkanides allegedly faced retaliation happened on multiple occasions, including emails and speech at meetings in which he shared his concerns about the financial mismanagement within the College and Administrators giving him improper clinical instructions.[4] [*See, e.g.*, R. 1 at 39-41.] It is true that, like in *Garcetti*, Dr.

---

[4] Above, the Court dismissed the portions of the complaint bringing untimely claims. One specific dismissed claim alleged that Dr. Kyrkanides being muted at the April 2020 meeting violated the First Amendment. [*See* R. 1 at 36.] But Dr. Kyrkanides's speech at that meeting is still relevant to the extent it constitutes protected speech giving rise to a retaliation claim. The relevant date is when the retaliatory act occurred (January 2021), not the protected conduct, so the speech can be considered for the purpose of this claim.

Kyrkanides's speech "owes its existence to his professional responsibilities" because he was only able to send these emails and attend meetings because of his role as a faculty member. 547 U.S. at 421-22. But the Supreme Court narrowed this element, which it framed as an "exception to First Amendment protection," in *Lane*. *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) (discussing *Lane v. Franks*, 134 S. Ct. 2369 (2014)). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S. Ct. at 2379. The Administrators do not allege that Dr. Kyrkanides had a duty to oversee the College's finances or ensure their operations were in accordance with the law, and professors would not typically have such responsibilities. [*See* R. 4-1 at 10-11.] This suggests the speech was not pursuant to his duties as a professor.

The motivation behind Dr. Kyrkanides's speech also shows he was speaking as a private citizen. He states he spoke because of his concern that the University was advising its faculty members to practice in a manner that "could have . . . expos[ed] the Plaintiff to serious legal consequences as a private citizen" and that the speech was "aim[ed] to address public/patient health safety, and Fraud and Abuse." [R. 1 at 26.] Such speech is comparable to that at issue in *Pucci*. The Sixth Circuit found that a court administrator was speaking as a private citizen when she complained to court officials that a judge was allowing his religious beliefs to affect his role. *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 768 (6th Cir. 2010). This complaint was outside of her official duties because it was "extraordinary rather than everyday communication" about the "propriety and legality" of the court's operations. *Id*. (citing *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986)). Dr. Kyrkanides's speech is analogous because his concerns touched on the propriety and legality of the College's operation and was not the sort of communication he would engage in regularly in his role as a professor. "Public interest is near its zenith when

ensuring that public organizations are being operated in accordance with the law." *Marohnic*, 800 F.2d at 616.  Accordingly, Dr. Kyrkanides did not speak about allegedly inappropriate directives and financial mismanagement "pursuant to [his] official duties rather than as a citizen." *Weisbarth v. Geauga Park Dist*., 499 F. 3d 538, 546 (6th Cir. 2007) (quotations omitted).

**b**

Next, the Administrators allege the complaint fails to establish that Dr. Kyrkanides's speech was not on a matter of public concern because it "does not set out the actual content of Dr. Kyrkanides's allegedly protected speech." [R. 4-1 at 12.]  This is mistaken.  For example, the complaint states that Dr. Kyrkanides's speech at the January 2021 faculty meeting was about "information he had collected with the State's Board of Dentistry" and "the directives he had received to engage in conduct that was and/or could have been a violation of the law." [R. 1 at 25-26.]  More context is included earlier in the complaint, which states that Dr. Kyrkanides's supervisors advised him to engage in clinical instruction without a license, he reported that direction to the Board of Dentistry, and the Board informed him that doing so was not permitted under Kentucky law. *Id.* at 11-12.  It follows that this is the information he shared at the January 2021 meeting.  The complaint does set out the content of the allegedly protected speech, so the Administrators' argument that they cannot address whether the speech was on a matter of public concern is unfounded.

**c**

The Administrators provide a more detailed argument asserting that Dr. Kyrkanides's interest in his speech does not outweigh the University's interest in operating efficiently. *Bennett*, 977 F.3d at 539.  They accurately argue that their interest in ensuring that the College of

11

Dentistry efficiently operates includes responding to conduct that hinders its operations.  [R. 4-1 at 12.]  They state "Dr. Kyrkanides's complaint and accompanying exhibits demonstrate that his repeated speeches at the orthodontics division faculty meetings adversely impacted the College of Dentistry."  *Id.* at 13.  The specific example provided is an email from Dr. Kluemper to Dr. Kyrkanides stating his conduct at the January 2021 faculty meeting was "angry, intimidating, and even threatening."  *Id.*

Resolution of this issue turns on the weight the Court must give to assertions made in the communications attached to the complaint.  "Documents attached to the pleadings," as well as documents referred to in the pleadings that are integral to its claims "become part of the pleadings and may be considered on a motion to dismiss."  *Commer. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c); *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999)).  But this incorporation primarily establishes the *existence* of the documents; the Court does not have to assume the veracity of statements made in such documents.  *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 441 (6th Cir. 2012) (citing *Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008)).  The rule that exhibits are adopted into the complaint "makes much less sense when, as is the case here, the exhibit is not a legally dispositive document."  *Id.* at 442 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455 (7th Cir. 1998)).

Dr. Kyrkanides is entitled to a "presumption of truth . . . at this stage of litigation" that is not overcome by assertions made in attached documents.  *Id.*  The complaint alleges that the assertions which the Administrators rely on—that Dr. Kyrkanides was "angry, intimidating, and even threatening"—are "far from the truth."  [R. 1 at 26; R. 4-1 at 13.]  The Court is required to accept as true Dr. Kyrkanides's assertion that his conduct at the January 2021 meeting was not

disruptive. As a result, the Court cannot assume the truth of Dr. Kluemper's contradictory statement that he was being disruptive, even though the email in which he made this claim was attached to the complaint. *See Carrier Corp.*, 673 F.3d at 441. This diminishes the Administrators' argument that their interest in efficient operation outweighs Dr. Kyrkanides's interest in free speech because assuming, as the Court must, that he was not being disruptive, there would be no justification for restricting his First Amendment rights. Accordingly, Dr. Kyrkanides has stated a plausible claim that his speech constitutes protected conduct.[5] As to Drs. Okeson and Kluemper, the Administrators do not argue that Dr. Kyrkanides failed to allege the remaining elements of a retaliation claim. [*See* R. 4-1 at 9-14.] The Court will deny the Administrators' Motion to Dismiss the First Amendment retaliation claim against Drs. Okeson and Kluemper for barring Dr. Kyrkanides from attending faculty meetings.

**2**

The Administrators also ask the Court to dismiss Dr. Kyrkanides's First Amendment retaliation claim to the extent it alleges that Mr. Thro's restrictions on his credentialing were retaliatory. [R. 4-1 at 17-20.] They claim that "becoming credentialed would only allow him to complete his assigned instructional duties, for which he is already being paid," and that he "never received clinical income." *Id.* at 17. Because Dr. Kyrkanides's Distribution of Effort did not include clinical work and he was never assigned clinical duties, the Administrators argue he cannot establish that an adverse action was taken to deprive him of such. *Id.* at 18-19.

---

[5] The Court recognizes a very similar case presented in the Eastern District of Michigan, in which the Court dismissed a retaliation claim against University Administrators because the pleadings showed that the Plaintiff Professor's conduct had an adverse impact on the department. [R. 4-1 at 12-13 (citing *Yohn v. Coleman*, 639 F. Supp. 2d 776 (E.D. Mich. 2009)).] However, that Court was resolving a Motion for Judgment on the Pleadings, or in the alternative, Summary Judgment. *Yohn*, 639 F. Supp. 776 at 780. It is unclear which standard applied to the court's dismissal of the claim. Further, in contrast to *Yohn*, in this matter there is a factual dispute over the disruptiveness of Dr. Kyrkanides's speech because he claims it was not disruptive while the Administrators assert that it was. *See id.* at 786. Therefore, the cases are distinct and the Court declines to rely on the non-binding ruling in *Yohn*.

The complaint states that in addition to Drs. Kluemper and Okeson's alleged retaliation, Mr. Thro engaged in retaliation by abridging Dr. Kyrkanides's privilege to engage in clinical activities. [R. 1 at 40.] Dr. Kyrkanides alleges that Mr. Thro advised the Credentialing Committee to not speak with him in retaliation for his speech. *Id.* at 31. He states his inability "to update his credentialing status and engage in clinical activities is due to the said directive by Mr. Thro to the Credentialing Committee to be passive aggressive towards Plaintiff's efforts to be credentialed, and thereby restrain Plaintiff from engaging in clinical activities." *Id.*

The Administrators insist that Dr. Kyrkanides's inability to engage in clinical practice is due to his own failure to become credentialed. [R. 4-1 at 18-20.] They cite to an email from Dr. Okeson to Dr. Kyrkanides, which states he can "transition to clinical care if/when [he] become[s] credentialed." *Id.* at 18 (citing R. 1-4). This email does not establish, as the Administrators suggest, that Dr. Kyrkanides is not credentialed because he "has refused to complete [the credentialing] forms." *Id.* The Court must accept Dr. Kyrkanides's allegations as true, and he alleges that he could not become credentialed because Mr. Thro directed the Credentialing Committee not to communicate with him. [R. 1 at 31.]

Therefore, the issue is not whether Dr. Kyrkanides had an expectation that he would be engaging in clinical practice. Rather, it is whether his allegation that Mr. Thro directed the Credentialing Committee from communicating with him, preventing him from becoming credentialed, was an adverse action in retaliation for his exercise of a constitutional right. The Administrators do not address this action by Mr. Thro, so the Court cannot grant their motion to dismiss Dr. Kyrkanides's First Amendment retaliation claim against Mr. Thro. [R. 4-1 at 17-20.]

**3**

The Administrators also argue that they are entitled to qualified immunity on Dr. Kyrkanides's claim for First Amendment retaliation because no controlling precedent clearly holds that he was speaking as a citizen on a matter of public concern or that his interest in that speech outweighed the University's interest in efficient operations.  [R. 4-1 at 14-17.]  Courts generally avoid ruling on the clearly established prong of the qualified immunity inquiry at the dismissal stage.  *See Crawford v. Tilley*, 15 F.4th 752, 765 (6th Cir. 2021).  The Sixth Circuit recently issued an opinion dealing with this issue specifically in the First Amendment retaliation context.  *Myers v. City of Centerville*, 2022 U.S. App. LEXIS 20118, at *32-33 (6th Cir. July 21, 2022).  It recognized that the "context-specific approach used in balancing tests like *Pickering's*" makes it especially difficult to determine whether the allegedly violated right was clearly established.  *Id.* at *32.  "Ultimately, whether a speech-retaliation claim is clearly established at the pleadings stage *rises and falls* with whether the claim was sufficiently alleged."  *Id.* (emphasis added).  Because the complaint in *Myers* established that the public employee spoke on a matter of public concern, his "right to [speak] without retaliation was clearly established" and the defendants were not entitled to *dismissal* based on qualified immunity.  *Id.* at *33.

The same is true here.  Above, the Court held that the complaint states a plausible claim for First Amendment retaliation.  Dismissal for qualified immunity is therefore inappropriate because at this stage, immunity "rises and falls" with the Court's conclusion that Dr. Kyrkanides sufficiently alleged his claim against Drs. Okeson and Kluemper and Mr. Thro.  *Id.*  The Administrators rely on *Baar* and *Garvie* to support their assertion that they are entitled to qualified immunity, but those cases resolved the issue at the summary judgment stage.  [R. 4-1 at 15-16 (citing *Baar v. Jefferson Cty. Bd. of Educ.*, 476 Fed. App'x 621 (6th Cir. 2012) and *Garvie*

*v. Jackson*, 845 F.2d 647 (6th Cir. 1988)).]  The case at hand is only at the dismissal stage, so the Court follows the Sixth Circuit's guidance and will not dismiss the First Amendment retaliation claim by applying qualified immunity.

## D

Next, the Administrators move to dismiss Count III, which Dr. Kyrkanides titled "Fourth Amendment: Violation of Plaintiff's Right to be Free from Unconstitutional Conditions."  [R. 4-1 at 20-22; R. 1 at 41.]  As an initial matter, and as the Administrators point out, there is no Fourth Amendment violation at issue here because there was no allegedly unconstitutional search or seizure.  [R. 4-1 at 20.]  It appears that Dr. Kyrkanides mistakenly stated this claim was pursuant to the Fourth Amendment.  [*See* R. 6-1 at 16.]  His response clarifies that Count III alleges the Administrators have placed an unconstitutional condition on his public employment by imposing on him a "duty" not to attend faculty meetings, which he alleges he has a First Amendment right to attend.  *Id.*  This is based on an email from Dr. Kluemper to Dr. Kyrkanides stating he was "instructing [him] not to attend future orthodontic faculty and staff meetings until further notice" and to "consider this instruction to be part of [his] duties as a tenured faculty member."  [R. 1-8.]  The Administrators argue that Dr. Kyrkanides fails to state an unconstitutional conditions claim because restricting his ability to attend faculty meetings directly does not violate the First Amendment, he does not have a First Amendment right to attend the meetings, and he has not shown the Administrators placed conditions on the benefit.  [R. 4-1 at 21-22.]

The unconstitutional-conditions doctrine prevents the government from coercing individuals into giving up their enumerated rights.  *Koontz v. St. John's River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).  Absent this doctrine, the government could "produce a result which

[it] could not command directly." *Speiser v. Randall*, 357 U.S. 513, 526 (1958). In the public employment context, governments cannot condition employment on the employer's abandonment of their constitutional rights. *Rust v. Sullivan*, 500 U.S. 173, 212 (1991) (collecting cases).

The Administrators' first argument that they have "already limited Dr. Kyrkanides's participation in faculty meetings" constitutionally—stated otherwise, that barring him from attending meetings was not retaliation—is precluded by the Court's earlier finding that Dr. Kyrkanides has stated a plausible claim for retaliation. [*See supra* Part II.C; R. 4-1 at 21.] They also argue that no condition has been placed on Dr. Kyrkanides's employment. [R. 4-1 at 22.] They state "Dr. Kyrkanides says throughout the complaint that Defendants have not given him the option to surrender his rights in exchange for good standing, but rather the UK Administrators simply removed his ability to attend the faculty meetings." *Id.* This is technically true; Dr. Kyrkanides was told not to attend faculty meetings rather than explicitly being given the "option" to surrender that ability. But his position in good standing is conditioned on not attending meetings because Dr. Kluemper told him to consider not attending meetings as "part of [his] duties as a tenured faculty member." [R. 1-8.] He could attend the meetings in violation of the instruction not to, but doing so would be considered a breach of one of his duties as a professor. This is clearly a condition on his employment with the University. Therefore, survival of this claim turns on whether Dr. Kyrkanides's ability to attend and speak at faculty meetings is protected by the First Amendment.

The Administrators argue there is no such right. [R. 4-1 at 21-22.] They rely only on *Rust v. Sullivan* for support, which held that federal funding for healthcare providers could be conditioned on requiring the providers to not advocate for abortion while carrying out the

program.  500 U.S. 173, 196 (1991).  They argue the case at hand is comparable because, like the providers' ability to advocate for abortion access outside of their work within the federally-funded program, "Dr. Kyrkanides remains free to participate in any non-defamatory speech he wishes in his free time or outside the Orthodontics Division meetings."  [R. 9 at 9.]

The regulation at issue in *Rust* was upheld because it was a condition on the funded program, not the recipient.  500 U.S. at 196.  *Rust* does not stand for the broader proposition that a public employee's free speech rights are not violated so long as he has other outlets for his speech.  It noted that the recipient organization and its staff were free to advocate for abortion outside of the funded project, but this was because the limitation on speech only applied to work conducted while carrying out the project.  *Id.*  Providers were free to speak on the issue beyond executing that program.  *Id.*  In contrast, Dr. Kyrkanides is facing a direct limitation on his ability to speak at all faculty meetings; he is not being prevented from speaking on certain matters only when carrying out specific projects.

Beyond the Administrators' misplaced reliance on *Rust,* neither party presents legal support establishing whether Dr. Kyrkanides has a First Amendment right to attend the faculty meetings.  [*See* R. 4-1 at 20-22; R. 6-1 at 16-18; R. 9 at 8-9.]  In fact, neither party even establishes which First Amendment framework would be used to analyze this right.  The Court recognizes this analysis is awkward because it will likely implicate both forum and the special public employee speech analyses.  This issue has not been sufficiently litigated, so the Court declines to dismiss Count III as to Drs. Okeson and Kluemper.

The Administrators' invocation of qualified immunity is also unavailing.  The Administrators do not provide any compelling support for their assertion that Dr. Kyrkanides does not have a clearly established First Amendment right to attend faculty meetings, so the

Court is unable to determine whether or not they committed a constitutional violation or if the right was clearly established.  [R. 4-1 at 22; R. 9 at 9.]  The Court will not grant the Administrators qualified immunity on Dr. Kyrkanides's unconstitutional conditions claim at this stage in the litigation.

The Court will dismiss Count III as to Mr. Thro because, though his name is listed in the Count, it only states he "is part of a campaign of on-going retaliation" against Dr. Kyrkanides. [R. 1 at 41.]  Mr. Thro's liability for retaliation is distinct from liability for imposing unconstitutional conditions, and nowhere in the complaint does Dr. Kyrkanides claim Mr. Thro was involved in his employment becoming conditioned on not attending faculty meetings. Accordingly, if he was attempting to state an unconstitutional conditions claim against Mr. Thro, he has failed to do so.

### E

Dr. Kyrkanides's final claim against the Administrators alleges that they violated his right to procedural due process by removing his right to participate in faculty meetings without notice, against University policy, and under vague and overbroad policies.  [R. 1 at 43.]  The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "No State shall deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.   The procedural component of the Due Process Clause protects rights created by state law and guarantees that no significant deprivation of life, liberty or property will take place until notice has been provided and the individual has a meaningful opportunity to be heard.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).  In *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989), the United States Supreme Court stated:

> We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571, 92 S. Ct. 2701, 2706, 33 L.Ed.2d 548 (1972); the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient, *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 871, 74 L. Ed. 2d 675. The types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire," *Board of Regents v. Roth*, 408 U.S. at 577, 92 S. Ct. at 2709, and must be based on more than "a unilateral hope," *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 465, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981). Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it.

*Thompson*, 490 U.S. at 460.

The Administrators' Motion only asks to dismiss Count IV by relying on their prior argument that Dr. Kyrkanides does not have a First Amendment right to attend and speak at faculty meetings, so there is no interest that was deprived. [R. 4-1 at 23-24.] Above, the Court rejected that argument, so it will not dismiss Count IV on this ground.

In his Response, Dr. Kyrkanides claims that Count IV is also premised on deprivation of his interests in his "reputation, good name, honor and integrity" and "opportunity to make money in the clinic." [R. 6-1 at 19.] The Administrators assert that "neither alleged deprivation is included in the complaint," so the Response is a "misguided" attempt to amend the complaint. [R. 9 at 10.] The Court agrees that the complaint does not put the Administrators on notice that Dr. Kyrkanides is pursuing a Due Process claim based on his interest in clinical income. Clinical opportunities are not mentioned at all in Count IV, so it fails to sufficiently state a claim based on such a deprivation. [R. 1 at 43-44.] Because the only allegation against Mr. Thro is that he interfered with Dr. Kyrkanides's clinical practice, Count IV is dismissed in its entirety against him.

But Count IV does state that Dr. Kyrkanides suffered "significant public embarrassment and humiliation" as a result of the Administrators' conduct. *Id.* at 43. To survive dismissal, the complaint must "[plead] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint alleges that Dr. Kyrkanides's ability to attend faculty meetings was taken without due process and "as a direct result," he suffered embarrassment and humiliation. [R. 1 at 43-44.] The Court can infer that his "good name, honor, and integrity" were at stake when he was barred from attending faculty meetings. *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972). Therefore, he has sufficiently stated a claim for a deprivation of his reputational interest without due process.

Again, the Administrators ask to dismiss Count IV based on qualified immunity. [R. 4-1 at 23-24.] This argument is insufficiently developed, as they state only that if there was a constitutional deprivation "reasonable administrators could disagree. Therefore, the Defendants are entitled to qualified immunity." *Id.* Again, the Court will not analyze the clearly established prong of the qualified immunity inquiry at this point because it has found that the complaint sufficiently states a claim for a constitutional deprivation. *See Crawford*, 15 F.4th at 765.

**F**

In his separate Motion to Dismiss, President Capilouto argues the complaint should be dismissed against him because he did not actively engage in any unconstitutional conduct and cannot be held liable for any such conduct by his subordinates through supervisory liability. [R. 5-1 at 4-7.] The complaint's only allegation regarding President Capilouto is that he received a recommendation from the SACPT outlining the situation surrounding Dr. Kyrkanides and recommending that he reinstate his ability to attend faculty meetings. [R. 1 at 33-34, 37, 44.] The recommendation is specifically mentioned in Counts I and IV but Counts II and III also

mention President Capilouto.  [*Id.* at 37, 40, 41, 44.]  Though no Count thoroughly elaborates its allegation against President Capilouto, the Court understands the complaint to attempt to bring each claim against him.

The Court agrees with President Capilouto's argument that he cannot be held liable for directly engaging in any unconstitutional conduct because "officials are generally held personally responsible only for their own unconstitutional actions, rather than a 'mere failure to act.'"  *Taylor v. City of Falmouth*, 187 Fed. App'x 596, 602 (quoting *Leach v. Shelby Co. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1990)).  The *only* alleged "action" by President Capilouto is his failure to respond to the SACPT recommendation, which is definitionally a "failure to act."

Supervisors like President Capilouto can be liable for their subordinates' unconstitutional conduct if the supervisor's failure to act constitutes implicit authorization, approval, or knowing acquiescence.  *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982).  Dr. Kyrkanides alleges that President Capilouto "knew or should have known" of his subordinates' unconstitutional conduct.  [R. 6-1 at 15.]  The complaint establishes that President Capilouto did know that Drs. Okeson and Kluemper barred Dr. Kyrkanides from attending faculty meetings because this conduct was outlined in the SACPT report.  [R. 1 at 33-34.]

Sixth Circuit precedent clearly holds that a supervisor cannot be held liable for their subordinates' unconstitutional conduct merely when they are informed of it and take no action. In *Shehee*, a prison warden was not liable for a subordinate's firing an inmate allegedly in retaliation for filing a grievance against other officers.  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  The warden was informed of the alleged retaliation but took no action.  *Id.* at 298. The Court found "Shehee's only claim is [the warden's] alleged failure to intervene on Shehee's behalf" which does not constitute direct participation, encouragement, authorization, or knowing

22

acquiescence "in the claimed retaliatory acts." *Id.* at 300.  The facts at hand are directly comparable.  Dr. Kyrkanides's complaint was forwarded to President Capilouto through the SACPT recommendation.  [R. 1 at 37.]  President Capilouto did not intervene on his behalf.  Under *Shehee*, this is plainly insufficient to impose supervisory liability.[6]  This is true for all of the Counts because the nature of the underlying unconstitutional conduct is irrelevant to the supervisory liability inquiry.  The only allegation regarding President Capilouto does not establish his liability for any underlying unconstitutional conduct arising from the situation the SACPT report apprised him of, so his Motion to Dismiss will be granted as to each of the Counts.

### III

Numerous claims remain and the parties may proceed to conduct discovery on them.  To summarize, Count I survives against Drs. Okeson and Kluemper for the allegation that banning Dr. Kyrkanides from attending and speaking at faculty meetings is a direct First Amendment violation.  Count II survives against Drs. Okeson and Kluemper for the allegation that the ban was in retaliation for Dr. Kyrkanides exercising his First Amendment rights, and against Mr. Thro for the allegation that his direction to the Credentialing Committee was retaliatory.  Count III survives against Drs. Okeson and Kluemper on the allegation that barring him from faculty meetings places an unconstitutional condition on his employment.  Finally, Count IV survives

---

[6] Another court in this Circuit analyzed what it framed as the "not entirely clear" supervisory liability legal standard. *Beausoleil v. Snyder*, 2021 U.S. Dist. LEXIS 29234, at *41 (E.D. Mich. Feb. 17, 2021).  On one hand, "a supervisor's knowledge of her subordinate's unconstitutional conduct coupled with a failure to take corrective action is not enough to hold the supervisor liable." *Id.*; *see also McCurtis v. Wood*, 76 Fed. App'x 632, 634 (6th Cir. 2003) (citing *Shehee*, 199 F.3d at 300).  But on the other hand, a supervisor's "knowing acquiescence" to a subordinate's unconstitutional actions establishes supervisory liability. *Id.* (citing *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 487-88 (6th Cir. 2020)).  "A failure to act while knowing of a subordinate's unconstitutional conduct sounds like 'knowing acquiesce[nce].' Yet the former does not render a supervisor liable and the latter does." *Id.* at *41-42.  The Court agrees that conduct like President Capilouto's "sounds like" knowing acquiescence.  But because his conduct is nearly identical to that which did not constitute knowing acquiescence in *Shehee*, the Court will follow that binding precedent.

against Drs. Okeson and Kluemper on the allegation that they barred him from attending meetings and harmed his reputation without due process.

Accordingly, and the Court being sufficiently advised, President Capilouto's Motion to Dismiss **[R. 5]** is **GRANTED** and the other Administrators' Motion to Dismiss **[R. 4]** is **GRANTED IN PART** and **DENIED IN PART**.  It is hereby **ORDERED** as follows:

1. Counts I, II, III, and IV are all **DISMISSED** to the extent they are premised on constitutional violations occurring before October 23, 2020;

2. Counts I, II, III, and IV are all **DISMISSED** as to Defendant Capilouto;

3. Count I is **DISMISSED** as to Defendant Thro;

4. Count III is **DISMISSED** as to Defendant Thro;

5. Count IV is **DISMISSED** to the extent it brings a Due Process claim based on a deprivation of Dr. Kyrkanides's interest in clinical income and privileges, and;

6. Count IV is **DISMISSED** as to Defendant Thro.


This the 8th day of September, 2022.

Gregory F. Van Tatenhove
United States District Judge

24