UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| STEPHANOS KYRKANIDES, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 5:21-cv-00270-GFVT |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| ELI CAPILOUTO, *et al.*, | ) | **&** |
| | ) | **ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Defendants' Motion to Dismiss Dr. Kyrkanides's amended complaint. [R. 14.] By prior Order, the Court partially granted and partially denied the Defendants' Motion to Dismiss Dr. Kyrkanides's original complaint, allowing certain claims to proceed to discovery. [R. 10.] Almost immediately thereafter, Dr. Kyrkanides filed an amended complaint. [R. 11.] The Defendants now move to dismiss the amended complaint. [R. 14.] For the reasons that follow, the Motion [R. 14] is **GRANTED IN PART** and **DENIED IN PART**.

**I**

The Court established the facts underlying this matter in its Order resolving the Motions to Dismiss Dr. Kyrkanides's original complaint. [R. 10 at 1-4.] Dr. Kyrkanides indicates that his amended complaint merely adds a claim for Intentional Infliction of Emotional Distress and "did not believe that it was important to change any facts." [R. 17 at 2.] Accordingly, the Court incorporates the facts as set out in its prior Order. Those facts are as follows:

Dr. Kyrkanides joined the University of Kentucky College of Dentistry faculty in 2015. [R. 1 at 9.] He states he was hired as an Orthodontics professor, while the Defendants state he was hired to be the Dean of the College. [*Id.*; R. 4-1 at 1.] Nevertheless, he was placed

"involuntarily"—the Administrators add "after he failed [as Dean]"—on "sabbatical/administrative leave" in early 2019. [R. 1 at 10.] As his sabbatical was nearing its end, his supervisors, including Dr. Okeson, called a meeting to determine his Distribution of Effort for the following year. *Id.*

During this meeting, he claims that his supervisors directed him "to engage in clinical instruction without a valid license." *Id.* at 11. Dr. Kyrkanides was concerned this could expose him to legal liability, so he asked the Kentucky Board of Dentistry if it would be appropriate for him to do so. *Id.* at 12. He alleges the Board informed him that such teaching would violate Kentucky law and asked him to file a formal report, which he did. *Id.* Further regarding Dr. Kyrkanides's clinical practice, he alleges he received conflicting directives regarding his clinical privileges after he returned from his sabbatical. *Id.* at 14. The Credentialing Committee granted him clinical privileges with the caveat that he had to be in the presence of another licensed attending physician. *Id.* However, his supervisor told him to begin independent clinical instruction. *Id.* In August of 2020, Dr. Kyrkanides reported this directive to the State Medicaid Office, Humana, and the Kentucky Board of Dentistry. *Id.* at 22.

Dr. Kyrkanides alleges that his first report to the Kentucky Board of Dentistry triggered his supervisors' "motivat[ion] to silence and punish Plaintiff for his exercise of free speech." *Id.* It appears that the first example of such punishment occurred at an April 2020 College of Dentistry Zoom meeting. *Id.* at 15. Dr. Kyrkanides got permission to speak from Dr. Okeson and presented financial information for the College that he had received pursuant to an open records request. *Id.* He claimed those records showed that the College was "at the brink of financial insolvency" due to "inefficiencies and waste of public funds" by the administration. *Id.* at 16. He alleges that his speech was "interrupted multiple times by the Associate Dean for

Finance and Administration" and that Dr. Okeson then muted Dr. Kyrkanides. *Id.* at 17. He remained muted for the remainder of the meeting. *Id.*

Dr. Kyrkanides again asked to be placed on the agenda of a College of Dentistry Division of Orthodontics Zoom meeting in January 2021. *Id.* at 25. He spoke about the directives regarding his clinical practice, his belief that he could have been subjected to liability if he complied, and shared information he obtained from his reports to the Medicaid Office, Humana, and the Kentucky Board of Dentistry. *Id.* at 25-26. Dr. Kyrkanides does not allege that this speech was interrupted at any point. But after the meeting, Dr. Kluemper emailed Dr. Kyrkanides and stated he had been "disruptive, unprofessional, and inaccurate." *Id.* at 26. Drs. Kluemper and Okeson then "threatened Plaintiff with immediate expulsion from meetings." *Id.* In response, Dr. Kyrkanides sent a number of emails to various individuals and groups within the College emphasizing his concerns. *Id.* at 28-29. Drs. Kluemper and Okeson then barred Dr. Kyrkanides from attending faculty meetings. *Id.* at 29. Dr. Kyrkanides asked Dr. Okeson if he could attend a meeting in early February 2021 and did not receive a response.

A handful of other incidents occurred over this time period which Dr. Kyrkanides alleges support his claims. In June 2020, he discovered a "new unrecognizable box" in his office and called the police. *Id.* at 20. The police opened the box and found that it contained a knife. *Id.* The knife and box were removed from his office. *Id.* at 21. A few days later, one of those officers searched his office for weapons but did not find any. *Id.* He believes the knife and the search were further retaliation for his speech. *Id.*

Further, Mr. Thro directed the Credentialing Committee to refrain from communicating with Dr. Kyrkanides in February 2021. *Id.* at 31. He claims that this action prevented him from "updat[ing] his credentialing status and engag[ing] in clinical activities." *Id.* Dr. Okeson

3

conducted a performance evaluation of Dr. Kyrkanides in March, which concluded that he had

not satisfied his assigned clinical duties.  *Id.* at 32.  He alleges this is only because he was unable

to communicate with the Credentialing Committee.  *Id.*

Around this time, Dr. Kyrkanides contacted the University's Senate Advisory Committee

on Privilege and Tenure about being barred from attending meetings.  *Id.*  The SACPT advised

President Capilouto that the decision "raises, at least, serious concerns that a faculty member's

academic privilege has been violated" and recommended that his ability to participate in

meetings should be restored.  *Id.* at 33.  President Capilouto did not respond to or adopt that

recommendation and Dr. Kyrkanides is still barred from participating in Department of

Orthodontics meetings.  *Id.* at 34.

Dr. Kyrkanides's original complaint alleged that President Capilouto, Mr. Thro, and Drs.

Okeson and Kluemper's conduct violated the First Amendment directly and by retaliation,

imposed unconstitutional conditions on his employment, and breached his right to procedural

due process.  [R. 1.]  The Court dismissed Counts I (First Amendment), III (First Amendment

retaliation), and IV (procedural due process) as to Mr. Thro, all Counts as to President Capilouto,

and all Counts to the extent that they made untimely allegations.  [R. 10 at 24.]  Rather than

proceed to discovery, Dr. Kyrkanides submitted an amended complaint which adds a claim for

intentional infliction of emotional distress.  [R. 11.]  The Defendants ask the Court to dismiss the

amended complaint in its entirety.  [R. 14.]

## II

The Defendants argue that Dr. Kyrkanides has failed to state a plausible claim for relief

and ask the Court to dismiss his complaint under Rule 12(b)(6).  [*See* R. 14-1 at 3.]  A motion to

dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a plaintiff's complaint.  In reviewing a

Rule 12(b)(6) motion, the Court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all inferences in favor of the plaintiff." *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). The Court, however, "need not accept as true legal conclusions or unwarranted factual inference." *Id.* (quoting *Gregory v. Shelby Cty.*, 220 F.3d 433, 446 (6th Cir. 2000)).

The Supreme Court has explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Courie v. Alcoa Wheel & Forged Products*, 577 F.3d 625, 629 (6th Cir. 2009). Stated otherwise, it is not enough for a claim to be merely possible; it must also be "plausible." *See Courie*, 577 F.3d at 630. According to the Court, "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

## A

Count I alleges that the Defendants abridged Dr. Kyrkanides's right to free speech. [R. 11 at 37-41.] He argues that the Defendants breached his First Amendment right to speak at the faculty meetings. *Id.* In its prior Order, the Court allowed this claim to proceed against Drs. Okeson and Kluemper. [R. 10 at 7-8.] In his amended complaint, Dr. Kyrkanides states that he "always spoke as a concerned private citizen," "outside the scope of his professional duties as a professor in the University of Kentucky." *Id.* The Defendants use these assertions to argue that Dr. Kyrkanides has no right to participate in faculty meetings as a private citizen, so his First Amendment claim cannot stand. [R. 14-1 at 6-12.]

**1**

In its prior Order, the Court explained that Count I erroneously includes many allegations which are more appropriately considered within Count II, which alleges first amendment retaliation.  [*See* R. 11 at 41-43.]  Within Count I, Dr. Kyrkanides explains many events which were allegedly committed in retaliation for his exercise of free speech.  *See, e.g.*, *id.* at 38 ("Plaintiff's speech was a substantial factor, if not the sole factor, in motivating Defendant Kluemper in abridging Plaintiff's free speech rights . . . [A]ny alternative reasons presented by the Defendants for abridging Plaintiff's free speech are pretextual."), 40 ("That Defendants exercised this unbridled discretion when they punished Plaintiff for expressing his concerns regarding issues he felt were of importance to the entire department, and that needed to be discussed.").  As the Court explained, "Count I brings a pure First Amendment claim separate from Count II's claim for First Amendment retaliation . . . Those claims are distinct because retaliation against an individual for exercising their First Amendment rights is different than an action preventing or interfering with the exercise of First Amendment rights."  [R. 10 at 7.]

This is true of the amended complaint as well.  Count I itself recognizes that it stands on two legs, stating "[t]herefore, the Defendants' motivation, is to silence the Plaintiff from further exercising his free speech and to retaliate against the Plaintiff for past speech."  [R. 11 at 39.]  The former—silencing the Plaintiff from further exercising his free speech—is properly considered within Count I as a pure first amendment claim.  *Id.*  But the latter—retaliating against the Plaintiff for past speech—raises first amendment retaliation, which is alleged in Count II.  *Id.*  The Court's analysis will proceed accordingly.

**2**

The Defendants first ask the Court to dismiss Count I because Dr. Kyrkanides seeks

access to an audience, not a forum.  [R. 14-1 at 7.]  True, there is "no constitutional right as

members of the public to a government audience for their policy views."  *Minn. State Bd. for*

*Cmty. Coll. v. Knight*, 465 U.S. 271, 286 (1984).  Dr. Kyrkanides's underlying desire may be for

a particular audience to hear his message.  But he clearly wishes to share that message in a

particular place: the UK College of Dentistry faculty meetings.  [*See* R. 14-1 at 41.]  And the

Defendants allegedly prevented him from speaking in that place.  *Id.*  Accordingly, Dr.

Kyrkanides is not merely seeking access to an audience.

The Defendants next argue that if Dr. Kyrkanides seeks access to a forum, not an

audience, the University was constitutionally permitted to regulate Dr. Kyrkanides's speech in

that forum.  [R. 14-1 at 8-10.]  They claim that the meetings are non-public fora and that they can

therefore regulate speech at those meetings so long as the restriction is reasonable.  *Id.*  Dr.

Kyrkanides suggests that the meetings are public fora because Kentucky's Open Meetings Act

makes them open to the public.  [R. 17 at 7.]

Both sides invoke forum analysis to resolve whether Count I survives dismissal.  But

forum analysis is not appropriate here because the alleged First Amendment infringement was by

a public employer against its employee.  The Court in *Amalgamated Transit Union v.*

*Chattanooga Area Reg'l Trans. Auth.* thoughtfully explained the interplay between forum

analysis and the *Pickering* public employee free speech doctrine.  431 F. Supp. 3d 961, 990 (E.D.

Tenn. 2020).  It observed that "forum analysis strikes the Court as unnecessary if not mutually

incompatible with the *Pickering* analysis."  *Id.*  It concluded that "a collective of courts views a

7

public forum analysis as superfluous in cases in which an employer-employee relationship exists—and this Court agrees with that view." *Id.* (collecting cases).

This Court also agrees. It is difficult to imagine how it could apply an amalgamation of the two analyses. The prior Order observed that the First Amendment analysis "is awkward because it will likely implicate both forum and the special public employee speech analyses." [R. 10 at 18.] Upon review, it is clear that the analyses are inconsistent and that *Pickering* alone is the appropriate test. *Amalgamated Transit*, 431 F. Supp. at 990.

When a public employee brings a first amendment claim against his employer, he must first "identify protected speech." *DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021). Here, this is satisfied because the defendants "accept *arguendo* that Dr. Kyrkanides's incessant and baseless ranting is speech protected by the First Amendment." [R. 14-1 at 8.] That speech must then "survive three inquiries to fall within the First Amendment." *DeCrane*, 12 F.4th at 594. The speech must address a matter of public, not private, concern, the speaker must be speaking as a private citizen, and the employee's interest in speaking must outweigh the employer's interest in operating. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 146-47 (1983); *Garcetti v. Ceballos*, 547 U.S. 410, 421-22, (2006); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).

Throughout their Motion to Dismiss, the Defendants emphasize Dr. Kyrkanides's representation that his speech was on "matters of public concern" and from the perspective of a "concerned private citizen." [*See, e.g.*, R. 14-1 at 6.] They argue that private citizens have no right to speak at faculty meetings, so they could not have violated his constitutional rights by preventing his speech as a private citizen. *Id.* at 6-7.

8

These arguments misunderstand the analysis. The fact that Dr. Kykanides was speaking as a private citizen on a matter of public concern does not preclude application of the public employee analysis and instead implicate a forum analysis. A public employee does not, as the Defendants suggest, choose whether they attend meetings in their capacity as a public employee or a private citizen. [R. 14-1 at 13 ("Dr. Kyrkanides's efforts to deny his status as a professor now prove too clever by a half: UK may also exclude him from UK's faculty meetings because, as Dr. Kyrkanides himself absolutely insists, he does not seek to attend them in his capacity as 'a member of the class of speakers for whose especial benefit the forum was created,' i.e., the UK orthodontics faculty.").] In fact, "[i]t is well understood that '[a]n employee's speech will rarely be entirely private or entirely public.'" *Akins v. Fulton Cty., Ga.*, 420 F.3d 1293, 1304 (11th Cir. 2005) (quoting *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993)). "[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417.

An individual can be both a public employee whose speech is subject to *Pickering* and be speaking as a private citizen. In fact, speaking as a private citizen on a matter of public concern is necessary for a public employee's speech to be protected. *Id.* This doctrine applies when the speech occurs at an internal employee meeting. *See Akins*, 420 F.3d at 1303-04 ("Even if Plaintiffs discussed private concerns regarding their work environment in the meeting, that does not disqualify them from protection."); *see also Warren v. Ohio Dep't of Pub. Safety*, 24 Fed. App'x 259, 268 (6th Cir. 2001). The Defendants' argument in favor of dismissing Count I applies forum analysis, not *Pickering*. [R. 14-1 at 8-26.] Because forum analysis is inappropriate, the Defendants present no apt grounds to dismiss Count I.

9

**3**

For the same reasons, the Court cannot impose qualified immunity at this stage.  As the prior Order recognized, "[c]ourts generally avoid ruling on the clearly established prong of the qualified immunity inquiry at the dismissal stage." [R. 10 at 15 (citing *Crawford v. Tilley*, 15 F.4th 752, 765 (6th Cir. 2021)).]  Specifically in the public employee speech context, "the 'context-specific approach used in balancing tests like *Pickering's*' makes it especially difficult to determine whether the allegedly violated right was clearly established." *Id.* (quoting *Myers v. City of Centerville*, 2022 U.S. App. LEXIS 20118, at *32 (6th Cir. July 21, 2022)).

The Defendants insist that qualified immunity is appropriate because the rights to attend faculty meetings and speak at those meetings and through the faculty email system are not clearly established.  [R. 14-1 at 21-23.]  But it is clearly established that public employees "do not surrender all their First Amendment rights by reason of their employment." *Garcetti*, 547 U.S. at 417.  And it is clearly established that a public employee's workplace speech is still protected if it is as a private citizen, on a matter of public concern, and their interest in speech outweighs the employer's interest in operating. *DeCrane*, 12 F.4th at 594.  Whether Dr. Kyrkanides's speech satisfies this test is precisely the type of fact-based inquiry which makes qualified immunity improper at this stage.  Accordingly, the Court again declines to apply qualified immunity.  The Motion to Dismiss is denied as to Count I.  As in its Order resolving the first Motion to Dismiss, Count I survives as to Defendants Okeson and Kluemper.

**B**

In Count II, Dr. Kyrkanides alleges First Amendment retaliation.  [R. 11 at 41-43.]  He claims that the Defendants engaged in a number of adverse actions to retaliate for his exercising his right to free speech.  *Id.*  The Court found that this Count survived dismissal as to Defendants

Kluemper, Okeson, and Thro in its Order resolving the first Motion to Dismiss. [R. 10 at 8-16.]

Now, the Defendants argue that the Court should dismiss Count II because Dr. Kyrkanides's

speech was "in his sole capacity as a concerned private citizen, not a member of the UK faculty."

[R. 14-1 at 13.]

> A claim for First Amendment retaliation must show:
>
> (1) that he was engaged in a constitutionally protected activity, (2) that the
> defendant's adverse action caused him to suffer an injury that would likely chill a
> person of ordinary firmness from continuing to engage in that activity; and (3)
> that the adverse action was motivated at least in part as a response to the exercise
> of his constitutional rights.

*Nair*, 443 F.3d at 477-78 (quoting *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 715 (6th

Cir. 2001)).  The three-part *Pickering* inquiry, discussed above, determines whether a public

employee's speech constitutes "constitutionally protected activity."  *See Boulton v. Swanson*, 795

F.3d 526, 530-31 (6th Cir. 2015).

In their second Motion to Dismiss, the Defendants assume *arguendo* that the first and

third elements are satisfied.  [R. 14-1 at 14.]  However, they argue that Drs. Okeson and

Kluemper banning Dr. Kyrkanides from faculty meetings was not an adverse action.  *Id.* at 14-

15.  They rely on Dr. Kyrkanides's assertion that he was acting as a private citizen to claim that

he has no right to attend the faculty meetings, so being barred from the meetings is not an

adverse action.  *Id.*  And they argue that his claim against Mr. Thro for allegedly directing the

credentialing committee to not communicate with Dr. Kyrkanides "fares worse."  *Id.* at 15.  Dr.

Kyrkanides does not allege that a private citizen "has any right to speak with a university's

credentialing committee," so the Defendants claim that Mr. Thro could permissibly direct the

committee to not speak with Dr. Kyrkanides.  *Id.*

These arguments are unfounded.  First, as the Court explained above, Dr. Kyrkanides's

claim that his speech was of public concern and as a private citizen does not preclude him from

11

First Amendment protection.  Second, an employee does not need to have a constitutional right to some aspect of their employment for a restriction of that aspect to constitute an adverse action. The Defendants cite no authority to this effect.  In reality, the standard is much lower.  "This Circuit has held that any action that would deter a person of ordinary firmness from exercising protected conduct will suffice." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999)).  Removing Dr. Kyrkanides's ability to attend or speak at meetings is certainly an "action." *Id.*  The question, therefore, is whether that action was sufficiently chilling to constitute an adverse action. *Id.*

The Defendants "accept (again *arguendo*) that any of the catalog of grievances that Dr. Kyrkanides compiled would likely chill a person of ordinary firmness from continuing to engage in a protected activity." [R. 14-1 at 16 n.53.]  This is sufficient to allow Count II to survive dismissal, as the Defendants also accepted that the first and third elements are satisfied.  [R. 14-1 at 14.]

The same is true as to his claim against Mr. Thro.  Whether a "concerned private citizen" has a "right to speak with a university's credentialing committee" is irrelevant.  [*See* R. 14-1 at 15.]  Dr. Kyrkanides alleges that Mr. Thro told the credentialing committee not to speak with him in retaliation for his speech.  [R. 11 at 33, 41-43.]  The Defendants concede that "any of the catalog of grievances that Dr. Kyrkanides compiled would likely chill a person of ordinary firmness from continuing to engage in a protected activity." [R. 14-1 at 16 n.53.]  Presumably, this includes Mr. Thro's instruction to the committee, so Dr. Kyrkanides states a plausible claim of retaliation.  Count II survives as to Defendants Okeson, Kluemper, and Thro.

**D**

In Count III, Dr. Kyrkanides alleges that the Defendants imposed unconstitutional conditions on his employment. [R. 11 at 41-43.]  The Court previously allowed this claim to proceed against Drs. Kluemper and Okeson but dismissed it as to Mr. Thro. [R. 10 at 16-19.] The defendants again seek dismissal of Count III.  They repeat the common refrain that Dr. Kyrkanides "has not alleged an enumerated constitutional right, because as demonstrated above, a concerned private citizen does not have a First Amendment right to attend and speak at UK orthodontics faculty meetings." [R. 14-1 at 16.]

The unconstitutional-conditions doctrine prevents the government from coercing individuals into giving up their enumerated rights. *Koontz v. St. John's River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).  Absent this doctrine, the government could "produce a result which [it] could not command directly." *Speiser v. Randall*, 357 U.S. 513, 526 (1958).  In the public employment context, governments cannot condition employment on the employer's abandonment of their constitutional rights. *Rust v. Sullivan*, 500 U.S. 173, 212 (1991) (collecting cases).

Again, the Defendants' argument relying on Dr. Kyrkanides's assertion that he was acting as a private citizen is not compelling.  He claims that the Defendants required him to abandon his rights to free speech and due process, not his right to attend faculty meetings.  While the Defendants believe that he has no First Amendment right to speak at those meetings, the Court explained above that they have not established as such at this stage.  And below, the Court explains that Dr. Kyrkanides's procedural due process claim also survives dismissal.  Dr. Kyrkanides has stated a plausible claim that the Defendants conditioned his employment on

13

relinquishing his rights to free speech and procedural due process.  Accordingly, Count III

continues to survive against Drs. Okeson and Kluemper.

E

In Count IV, Dr. Kyrkanides alleges that the Defendants violated his right to procedural

due process by removing his right to speak at and participate in faculty meetings without notice,

against University policy, and under vague and overbroad policies.  [R. 11 at 45-47.]  In its prior

Order, the Court allowed Count IV to proceed against Drs. Okeson and Kluemper but only to the

extent that it alleges that they "barred him from attending meetings and harmed his reputation

without due process."  [R. 10 at 24.]  The Defendants ask to dismiss this claim, yet again arguing

that he has no right to attend faculty meetings.  [R. 14-1 at 16.]  They also claim that a First

Amendment right cannot be "property" underlying a due process claim and that Dr. Kyrkanides's

allegation of reputational harm is insufficient on its own to sustain such a claim.  *Id.* at 17-18.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution

provides that "No State shall deprive any person of life, liberty, or property, without due process

of law."  U.S. Const. amend. XIV.   The procedural component of the Due Process Clause

protects rights created by state law and guarantees that no significant deprivation of life, liberty

or property will take place until notice has been provided and the individual has a meaningful

opportunity to be heard.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).  In

*Ky. Dep't of Corr. v. Thompson*, the United States Supreme Court stated:

> We examine procedural due process questions in two steps: the first asks whether
> there exists a liberty or property interest which has been interfered with by the
> State; the second examines whether the procedures attendant upon that
> deprivation were constitutionally sufficient.  The types of interests that constitute
> "liberty" and "property" for Fourteenth Amendment purposes are not unlimited;
> the interest must rise to more than "an abstract need or desire," and must be based
> on more than "a unilateral hope[.]" Rather, an individual claiming a protected
> interest must have a legitimate claim of entitlement to it.

14

490 U.S. 454, 460 (1989) (citations omitted).

Because the Court determined that Dr. Kyrkanides stated a plausible First Amendment claim, it rejects the Defendants' argument that he has established no First Amendment right to attend and speak at the faculty meetings. Further, they suggest that Dr. Kyrkanides cannot base a procedural due process claim on deprivation of his free speech rights. [R. 14-1 at 16-17 ("[E]ven an alleged violation of the First Amendment cannot form the "property right" underlying a Fourteenth Amendment procedural due process claim.").] But in fact, "First Amendment rights may constitute a liberty interest under the Due Process Clause." *Jackson v. City of Columbus*, 194 F.3d 737, 749 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

The Defendants also challenge Dr. Kyrkanides's procedural due process claim to the extent it alleges reputational harm. [R. 14-1 at 17-18.] They argue that such a claim must be paired with termination to constitute a procedural due process violation. In *Quinn v. Shirey*, the Sixth Circuit recognized that stigmatizing statements must be paired with "[s]ome alteration of a right or status 'previously recognized by state law.'" 293 F.3d 319 (quoting *Paul v. Davis*, 424 U.S. 693, 711-12, 96 S.Ct. 1155, 47 L.Ed.2d 405). The first of five factors the Sixth Circuit established for these types of claims clarifies that "the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment." *Id.* at 320. Recently, the Sixth Circuit stated that "termination from employment" is "required by the first *Quinn* factor." *Crosby v. Univ. of Ky.*, 863 F.3d 545, 556 (6th Cir. 2017). It concluded that "removal from a nontenured administrative position" is not comparable to termination and cannot provide the basis for a reputational deprivation claim. *Id.*

15

Dr. Kyrkanides has not alleged any change in his employment status which could, when paired with reputational harm, constitute a procedural due process claim. His response to the Motion to Dismiss did not address this argument. [R. 17 at 12.] He does not claim that his reputational harm was paired with any action comparable to termination. Accordingly, he does not state a plausible claim that the Defendants violated his right to procedural due process by causing him reputational harm. The Court will dismiss Count IV to the extent that it is based on reputational harm.

<strong>F</strong>

Finally, Dr. Kyrkanides's amended complaint adds Count V, which alleges Intentional Infliction of Emotional Distress. [R. 11 at 47-49.] He alleges that Drs. Kluemper and Okeson and Mr. Thro's actions were "reckless, wanton, intentional, continuous and done with malice to cause the Plaintiff harm" and caused him emotional distress requiring medical treatment. *Id.* The Defendants seek dismissal of this claim. [R. 14-1 at 24-25.] They emphasize the high bar for such claims in Kentucky. *Id.*

Dr. Kyrkanides's response ultimately asks the Court to delay consideration of this claim. [R. 17 at 12-13.] But as the Defendants argue, the Court can determine whether conduct is sufficiently outrageous to support an IIED claim. [R. 14-1 at 25 (citing Restatement (Second) of Torts § 46 cmt. h (1965) ("It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so."))]. Accordingly, the Court will not delay consideration of this claim.

Dr. Kyrkanides's response is useful to identify the precise conduct which he believes was outrageous. He references "barring the Plaintiff from public meetings, muting the Plaintiff['s]

speech during public meetings[,] and blocking his emails and send[ing] 3000 emails to junk mail when he is a professor." [R. 11 at 13.] This conduct is far from comparably outrageous to many circumstances which have been deemed insufficient to raise an IIED claim. For example, forcing employees to work overtime then firing them for violating corporate policy against working overtime is not sufficiently outrageous. *Bevins v. Dollar General Corp.*, 952 F. Supp. 504, 511 (E.D. Ky. 1997). Nor is an employer stating that an employee "might as well have been a 'murderer, rapist or child molester, that it wouldn't be any worse.'" *Pierce v. Commonwealth Life Ins. Co.*, 825 F. Supp. 783, 789 (E.D. Ky. 1993). Those actions are significantly more outrageous than the conduct which Dr. Kyrkanides identifies. Accordingly, "barring the Plaintiff from public meetings, muting the Plaintiff['s] speech during public meetings[,] and blocking his emails and send[ing] 3000 emails to junk mail when he is a professor" cannot support an IIED claim. [R. 11 at 13.] The Court will dismiss Count V.

### III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. The Defendants' Motion to Dismiss **[R. 14]** is **GRANTED IN PART** and **DENIED IN PART**;

2. Count IV of the amended complaint is **DISMISSED** to the extent it is premised on reputational harm;

3. Count V of the amended complaint is **DISMISSED** in its entirety.

This the 25th day of July, 2023.

Gregory F. Van Tatenhove
United States District Judge

18