UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| STEPHANOS KYRKANIDES, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:21-cv-00270-REW |
| | ) | |
| V. | ) | |
| | ) | |
| G. THOMAS KLUEMPER, *et al.*, | ) | OPINION & ORDER |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendants G. Thomas Kluemper, Jeffrey P. Okeson, and William E. Thro move for summary judgment, seeking dismissal with prejudice of Plaintiff Stephanos Kyrkanides's First Amended Complaint.  *See* DE 96 (Motion for Summary Judgment); DE 96-1 (Memorandum in Support).  Dr. Kyrkanides responded in opposition, *see* DE 99 (Response), and Defendants replied, *see* DE 102 (Reply).  Finding no triable issue in the case, Defendants' Motion for Summary Judgment (DE 96) is **GRANTED**.

## I.   BACKGROUND

The case has a convoluted history and already has been through multiple dismissal rulings. The Court draws from those rulings (DE 10; DE 21) and the full record in limning the dispute.

In 2015, Dr. Stephanos Kyrkanides joined the faculty of the University of Kentucky College of Dentistry as a professor in the Orthodontics Division and as Dean of the College.  *See* DE 11 at 10 ¶ 27; DE 99 at 1.  In January 2019, Dr. Kyrkanides was removed from his position as Dean and placed "involuntarily" on "sabbatical/administrative leave" for one year.  *See* DE 11 at 10 ¶ 28.  In December 2019, as his sabbatical neared its end, his supervisors called a meeting to

discuss his Distribution of Effort (DOE) for the following year. *See id.* ¶ 29. During this meeting, Kyrkanides claims his supervisors directed him "to engage in clinical instruction without a valid license" but "refrain from entering treatment notes in the electronic health record." *See id.* at 12 ¶ 33. Dr. Kyrkanides was concerned this could expose him to legal liability, so he asked the Kentucky Board of Dentistry if it would be appropriate for him to follow this instruction. *See id.* ¶ 34. He alleges the Board informed him that such teaching would violate Kentucky law and asked him to file a formal report, which he did. *See id.*

After returning from his sabbatical, Dr. Kyrkanides alleges he again received conflicting directives regarding his clinical activities. *See id.* at 15 ¶ 42. In June 2020, the Credentialing Committee conditionally granted him clinical privileges, subject to a proctoring program, pending satisfactory proctor assessment and final credentialing. *See* DE 99-3. However, he alleges his supervisor told him to begin independent clinical instruction notwithstanding his conditional clinical privileges. *See* DE 11 at 15 ¶ 45. In August 2020, Dr. Kyrkanides reported this directive to the State Medicaid Office, Humana, and the Kentucky Board of Dentistry. *See id.* at 23 ¶ 74.

Dr. Kyrkanides alleges that his first report to the Kentucky Board of Dentistry regarding the alleged directive he received at his 2019 DOE meeting prompted his supervisors' motivation to punish him for the exercise of free speech. *See id.* at 14 ¶¶ 38-40. It appears the first example of such claimed punishment occurred at an earlier April 2020 College of Dentistry faculty Zoom meeting. *See id.* at 16 ¶ 47. Dr. Kyrkanides received permission from Dr. Okeson "to speak on a matter of public concern." *See id.* He spoke during the meeting about financial information for the College he received pursuant to an open records request. *See id.* He claimed those records showed the College was "at the brink of financial insolvency" due to "inefficiencies and waste of public funds" by the administration. *See id.* at 17 ¶ 50. He alleges his speech was "interrupted

2

multiple times by the Associate Dean for Finance and Administration" and that Dr. Okeson eventually muted him on the call. *See id.* at 17-18 ¶¶ 52-53. He remained involuntarily muted for the remainder of the meeting. *See id.* at 18 ¶ 54.

Months later, Dr. Kyrkanides asked to be placed on the agenda of a College of Dentistry Division of Orthodontics Zoom meeting in January 2021. *See id.* at 27 ¶ 88. He alleges he spoke about the directives regarding his clinical practice, expressed his belief that he could have been subjected to liability if he complied, and shared information he obtained from his reports to the Medicaid Office, Humana, and the Kentucky Board of Dentistry. *See id.* ¶¶ 90-91. Dr. Kyrkanides does not allege that this speech was interrupted at any point. But after the meeting, Dr. Kluemper, the Division Chief of Orthodontics, emailed Dr. Kyrkanides and stated he had been "disruptive, unprofessional and inaccurate, 'angry, intimidating, and even threatening.'" *See id.* at 28 ¶ 94. Drs. Kluemper and Okeson then "threatened Plaintiff with immediate expulsion from meetings." *See id.* ¶ 95. In response, Dr. Kyrkanides sent several emails to various individuals and groups within the College regarding the Division meeting. *See id.* at 29-30 ¶¶ 99-101. Drs. Kluemper and Okeson then barred Dr. Kyrkanides from attending weekly Division of Orthodontics meetings. *See id.* at 31 ¶ 102. A few weeks later, Dr. Kyrkanides asked Dr. Okeson if he could attend a particular upcoming meeting, but Dr. Kyrkanides did not receive a response. *See id.* at 33 ¶ 107.

Further, Dr. Kyrkanides alleges Defendant Thro, the University of Kentucky's General Counsel, directed the Credentialing Committee to refrain from communicating with him in February 2021. *See id.* at 33 ¶ 108. He claims this action prevented him from "updat[ing] his credentialing status and engag[ing] in clinical activities." *See id.* Dr. Kluemper conducted a performance evaluation of Dr. Kyrkanides in March 2021 and concluded that Dr. Kyrkanides had

not satisfied his assigned clinical duties. *See id.* at 34 ¶ 111. Dr. Kyrkanides ascribes this failure to his inability to communicate with the Credentialing Committee. [1] *See id.*

Ultimately, Defendants characterize their actions toward Plaintiff as an attempt to manage Dr. Kyrkanides's "unprofessional and disruptive behavior." *See* DE 96-1 at 5. Dr. Kyrkanides counter-characterizes them as violations of his constitutional rights; he initiated this case alleging as such. Defendants first moved to dismiss Dr. Kyrkanides's claims, *see* DE 4; DE 5, which the Court granted in part and denied in part. *See* DE 10. The Court dismissed Counts I (First Amendment), III (First Amendment retaliation), and IV (procedural due process) as to Mr. Thro, all Counts as to original-defendant President Capilouto, and all Counts to the extent that they made untimely allegations. *See id.* at 24. The case was not filed until October 23, 2021, so actions happening through October of 2020 were out of temporal bounds except to the extent they might be antecedents for later acts. The Plaintiff then filed an Amended Complaint, which added a claim for intentional infliction of emotional distress. *See* DE 11. Defendants moved to dismiss the Amended Complaint in its entirety. *See* DE 14. The Court again granted in part and denied in part, dismissing Count IV to the extent it was premised on reputational harm and Count V (intentional infliction of emotional distress) in its entirety. *See* DE 21 at 17.

The remaining claims are Count I (violation of the Plaintiff's First Amendment right to free speech), Count II (First Amendment retaliation), Count III (violation of the unconstitutional conditions doctrine), and Count IV (procedural due process violation). Defendants now move for summary judgment on all remaining counts. *See generally* DE 96. The matter is fully briefed and ripe for review.

---

[1] Around this time, Dr. Kyrkanides contacted the University's Senate Advisory Committee on Privilege and Tenure about being barred from attending meetings. *See* DE 11 at 35. The SACPT raised procedural concerns regarding internal UK discipline but ultimately declined jurisdiction over the matter. *See* DE 99-5.

## II.   LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(a)–(c).  If the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute of material fact.  *See Shreve v. Franklin Cnty.*, 743 F.3d 126, 131 (6th Cir. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986)).  The moving party bears the initial burden of showing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2552 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009) ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute.").  If the moving party satisfies its burden, the burden shifts to the non-moving party to produce "specific facts" that suggest a "genuine issue" for trial.  *See Celotex Corp.*, 106 S. Ct. at 2553.  If the non-moving party cannot make a showing sufficient to establish the existence of an essential element of their case, then "Rule 56(c) mandates the entry of summary judgment." *Id.* at 2552.

In determining whether a genuine dispute of material fact exists, the Court construes all facts and draws all reasonable inferences in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356; *Guptill v. City of Chattanooga*, 160 F.4th 768, 776 (6th Cir. 2025).  At this stage, the Court may not "weigh the evidence [or] determine the truth of the matter" in evaluating whether there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The substantive law governing the dispute dictates whether a fact is "material."  *See Anderson*, 106 S. Ct. at 2510.  That is, "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual

5

disputes that are irrelevant or unnecessary will not be counted." *Id.*  An issue is "genuine" when "there is sufficient evidence favoring the [non-moving] party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 88 S. Ct. 1575, 1592 (1968)).

A few important notes, in light of the briefing at DE 96, DE 99, and DE 102.  The Court will not comb the record to look for evidence in support of Plaintiff's positions.  Broad swaths of DE 99, Kyrkanides's response, are citation free, referencing events or allegations with utterly no factual support denoted from the record.  *See, e.g.*, DE 99 at 3-4, 10 (criticizing Defendants' allegations (which reflect affidavit proof) but citing no counter proof); 13-14 (citing a roster of adverse actions with nary a record reference); 15-16 (citing a roster of actions by Thro with no references to proof).  A factual allegation without a corresponding record cite truly is a nullity, in this context.

Further, Judge Van Tatenhove's prior ruling took pre-October 21, 2023, conduct off the table except as a retaliation predicate.  Plaintiff's use of stale conduct to bolster other claims is ineffectual.  Where Defendants support their arguments with proper proof, the summary judgment burden shifts to the Plaintiff.  Additionally, when a defendant raises qualified immunity, the Plaintiff has the burden of establishing the absence of that defense.  *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

As to this record, the key aspects include the correspondence, the parties' affidavits, and the recorded January 2021 Division of Orthodontics zoom.  As is often the case when a video captures events at issue under § 1983, the Court can accept what the video fairly conveys.  *See Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007) (noting that, in a case involving video, a court at summary judgment should view facts in the light depicted by the videotape and should not adopt a version of facts "blatantly contradicted by the record, so that no reasonable jury could believe

6

it"). Thus, while the parties may have their own characterizations, in many indisputable ways, the video at the core of the case speaks for itself.

### III.    ANALYSIS

#### a.    Violation of Plaintiff's First Amendment Right to Free Speech

Dr. Kyrkanides's outstanding First Amendment claim for infringement alleges that Defendants Okeson and Kluemper violated his First Amendment right to free speech by banning him from attending and speaking at Divisional meetings via Dr. Kluemper's January 2021 email. *See* DE 11 at 37-41; DE 96-7. That bar is the lone area at issue under Count I. *See* DE 10 at 6-7; 13; DE 21 at 10. Without contradiction, Defendants call this a one-hour weekly admin meeting involving only Divisional personnel. *See* DE 96 at 17. They deny any other limit on faculty meeting access and point to the limitless communications Dr. Kyrkanides otherwise enjoyed via every other channel.

In a First Amendment claim, the plaintiff must first "identify protected speech." *See DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021). For public employees, the speech "must survive three inquiries to fall within the First Amendment." *See id.* First, the speech must address a "matter of public concern." *See id.* (citing *Connick v. Myers*, 103 S. Ct. 1684, 1690 (1983)). Second, the employee must be speaking "as a private citizen rather than pursuant to the employee's job duties." *See id.* (citing *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006)). Third, the employee's interest in speaking must outweigh the employer's interest in operating, commonly referred to as "*Pickering* balancing." *See id.* (citing *Pickering v. Bd of Educ. of Twp. High Sch. Dist. 205*, 88 S. Ct. 1731, 1734-35 (1968)).[2] "Whether a public employee's speech is

---

[2] "Application of the *Pickering* balancing test is a matter of law for the court to decide." *Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004). When there are genuinely disputed material facts on a balancing

7

constitutionally protected is a question of law." *Myers v. City of Centerville, Ohio*, 41 F.4th 746, 760 (6th Cir. 2022) (citing *Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456, 463 (6th Cir. 2017)).

Defendants contend Dr. Kyrkanides's speech fails all three inquiries. *See* DE 96-1 at 10. Specifically, Defendants claim Dr. Kyrkanides was speaking on private-concern matters, was not speaking as a private citizen, and his interest in speaking, indeed, speaking in a manner that introduced disruption and alarm, did not outweigh the College's interest in promoting a functioning work environment. *See id.* at 10, 22. Defendants also assert that qualified immunity entitles them to summary judgment in the event the Court determines Defendants violated Dr. Kyrkanides's First Amendment rights. *See id.* at 14.

Importantly, the meeting bar arose from and followed the January 15, 2021, zoom call. The call occurred, and Dr. Kluemper issued a corrective post-call email to Dr. Kyrkanides. Kyrkanides then launched a volley of communications[3] across the Division, and on January 28, given interim information developed regarding the impact of the zoom call, Kluemper imposed the ban. Dr. Kluemper backs the determination of disruption with an Affidavit reporting faculty complaints and reactions concerning meeting conduct by Plaintiff. *See* DE 96-4 at 3 ¶¶ 8-15. Dr. Kyrkanides has his own characterizations of the zoom call but offers no evidence on the legitimacy of Kluemper's proof of disruption. Further, Dr. Kyrkanides directly attributed the ban to the events of January 15, 2021. *See* DE 96-9.

---

element, a jury may resolve those determinations in aiding the Court's balancing. *See Pucci v. Nineteenth Dist. Court*, 596 F. App'x 460, 470 (6th Cir. 2015). The Court does not require factual resolution from a jury for this motion, as the videotape of the behavior at issue and the uncontested affidavit portions eliminate any factual dispute as to *Pickering*.

[3] These appear at DE 11-5, 11-6, and 11-7. Their clear import, in emails Kyrkanides circulated to the full Division, was that he wanted to litigate Dr. Kluemper's view of the call conduct.

### i.  Matter of Public Concern

The Court first addresses private versus public concern, because if Dr. Kyrkanides's speech cannot be "fairly characterized as constituting speech on a matter of public concern," the Court need not scrutinize whether the prohibition was constitutional.  *See Connick*, 103 S. Ct. at 1690. Speech addresses a matter of public concern if it can be "considered as relating to any matter of political, social, or other concern to the community."  *See id.*  In making its determination, the Court must consider the "content, form, and context of a given statement, as revealed by the whole record."  *See id.*  "Where the speech at issue involves mixed questions of private and public concern . . . the court must make a factual determination whether the employee's personal interest predominates over his interest as a citizen."  *See Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 966 (6th Cir. 2002).

Dr. Kyrkanides contends his speech regarded "public health and safety, fraud and abuse of public funds, and the quality of student education."  *See* DE 99 at 6.  Moreover, he characterizes these as matters of public concern because the speech was intended to ensure that the College was "being operated in accordance with the law."  *See id.* (citing *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986) (per curiam)).  In *Marohnic*, the plaintiff aided an investigation conducted by the Kentucky Attorney General's office concerning alleged Medicaid fraud being committed by his employer.  *See id.* at 614.  The Sixth Circuit held this speech was of public concern, explaining that its purpose of "ensuring that public organizations are being operated in accordance with the law, and seeing that public funds are not purloined" satisfied the inquiry.  *See id.* at 616 (citation omitted).

Defendants maintain that Dr. Kyrkanides's speech was not aimed at addressing matters of public concern and instead was "personal in nature."  *See* DE 96-1 at 22-23.  Speech does not

9

address a matter of public concern where its purpose is to "air or remedy grievances of a purely personal nature." *See Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 767 (6th Cir. 2004) (citing *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1226 (6th Cir. 1997)). Even where the employee grievance concerned an employer's adherence to proper procedure, the Sixth Circuit found a "public concern" determination improper because it resembled "an internal dispute over a job" rather than "the plea of a concerned citizen to her government to follow proper procedures." *See Gragg*, 289 F.3d at 967.

The April 2020 events, even all events prior to October 23, 2020, are not germane to Count I, which Judge Van Tatenhove trimmed to the Divisional meeting bar, an action arising from the January 2021 Division zoom. The claim is for "silencing the Plaintiff from further exercising his free speech" and exists only as to conduct within the allowed temporal period, with the January 2021 event being the empirical foundation. The effect of prior orders eliminates any Count I claim arising from pre-October 2020 behavior.

As for the January 2021 meeting, Dr. Kluemper stated in his affidavit that Dr. Kyrkanides declared the following: (1) DSP (clinic) income is as much his as it is those who practice, (2) he "will get his share" of income he thought was rightfully his, (3) he will show up for his scheduled time in the grad clinic, credentialed or not, but provide no clinical supervision or otherwise, and (4) he could not guarantee his availability for his scheduled lectures or seminars due to the ongoing depositions and other meetings related to University litigation. *See* DE 96-4 at 3. Dr. Kyrkanides, in his own affidavit, does not dispute the substantive contents of Defendant Kluemper's affidavit; he only clarifies that "the import of [his] concerns was the public safety aspect which was resulting or would result from the practices of the college, and the quality of students' clinical education,

10

which is an academic issue of public concern." *See* DE 99-1 at 4.  The Court audited the full Divisional call and views the record in light of the objective video content.

Dr. Kyrkanides spoke at four segments.  His involvement targeted predominately personal grievances and feelings of mistreatment, not matters of public concern.  *See* DE 96-6 (Video Recording of 1/15/2021 Faculty Meeting) at 4:57-12:08, 23:04-24:12, 37:23-41:45, 48:53-57:30. Thus, in segment one, Dr. Kyrkanides inserted himself into the discussion to complain that, regarding a computer or clinic training/scheduling issue, he had been "singled out," that the Division was "not taking care of me," and that the College would just, using a Bronx cheer, "let him drown."  His entire focus was on his own treatment as he accused both Dr. Kluemper and another call participant (Beeman) of doing things "for everybody else and not for me."  He was accusatory, confrontational, interrupting, and sarcastic ("thank you"), at one point abruptly exiting and another angrily jabbing his finger toward the screen.

In segment two, he merely described his clinic status and cited open-ended legal authority issues that may affect that status.  Segment three reflected Kyrkanides's view that distinct University litigation would create scheduling conflicts that, with late notice, would impact his ability to work assigned duties.  Thus, he claimed that his need to attend depositions, with notice given only the "night before," might render him unable to attend assigned lectures or other duties. This was all in the context of specific other UK litigation, not in the context of any general public interest.

Finally, for nine minutes at call's end, Kyrkanides drew lines on what he would do in clinic and how he would appear in clinic, demanded that he be paid his share of clinic income ("I have the right," or demanding "My portion" of the money), and complained about his DOE.  He tried to debate Kluemper on credentialling status.  Participant Beeman caught a lull and proceeded to

11

address Kyrkanides's prior claims against her (i.e., of not helping him) from earlier in the call, assuring that she was fully willing to help him as she had helped other faculty members. This prompted a lengthy diatribe in which Kyrkanides made accusations about his treatment, was personally accusatory toward the Division Chair and others, relayed a series of allegations regarding personal conduct over time, and concluded by sarcastically calling the treatment "ridiculous" and "amazing" before resting his chin on his hand in exaggerated bemusement. He focused on alleged mistreatment of himself, as a colleague and former Dean. He repeatedly used "I," "my," and "me," making the undoubted gravamen of the remarks and the entire display one centered on and about Dr. Kyrkanides and his singular interests.

Internal grievances and "quintessential employee beef" do not amount to matters of public concern. *See Myers*, 41 F.4th at 761. As presented on the call, Dr. Kyrkanides's complaints regarding his isolation, his availability to attend the clinic, his schedule, his privileges in the clinic, his litigation obligations, and his share of clinical income are aptly characterized as personal grievances with the administration of the College of Dentistry and "something that only the employees themselves would be concerned about." *Golembiewski v. Logie*, 516 F. App'x 476, 477 (6th Cir. 2013).

Therefore, the Court finds that Dr. Kyrkanides, relative to the January 15, 2021, zoom call, was not speaking on a matter of public concern and was thus not within the category of employee speech protected by the First Amendment.

### ii. Speaking as a Private Citizen

Even if Dr. Kyrkanides spoke on matters of public concern, his claim still fails because he was speaking pursuant to his employee duties rather than as a private citizen. *See DeCrane*, 12 F.4th at 594. The First Amendment does not protect public employee speech made pursuant to the

speaker's official duties; it protects only that speech made as a private citizen. *Barton v. Neeley*, 114 F.4th 581, 588 (6th Cir. 2024) (citing *Garcetti*, 126 S. Ct. at 1960). "[T]he question of whether a statement was spoken as a public employee or as a private citizen for First Amendment purposes [is] 'a practical one,' requiring a fact-specific inquiry into the 'duties an employee actually is expected to perform.'" *Id.* (citing *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010)). Courts should consider, *inter alia*, the speech's impetus, setting, audience, and general subject matter. *See Handy-Clay*, 695 F.3d at 540. "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014).

The meeting, one of restricted participation, expressly concerned functions, scheduling, and operations within the orthodontic Division. Dr. Kyrkanides contends that he was speaking outside the scope of his professorial duties as a private citizen. *See* DE 99 at 6. Defendants argue that Dr. Kyrkanides was speaking pursuant to his official duties and not as a private citizen because the speech occurred at a faculty meeting, dedicated to faculty administration, to which only specific government employees were invited. *See* DE 96-1 at 11. Further, Defendants characterize his speech as regarding compensation, Plaintiff's ability to do his job, and potential scheduling conflicts related to his job and litigation in which he was involved. *See id.*

The sole case cited by Dr. Kyrkanides on this *DeCrane* prong is *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 768 (6th Cir. 2010). In that case, Pucci was a court administrator who was terminated for her complaints to state court officials about a judge's use of religious language from the bench. *See id.* at 755. The Sixth Circuit found that "the nature of Pucci's complaints implicates the propriety and legality of public, in-court judicial conduct, and renders her speech of sufficient public gravity to warrant First Amendment protection." *See id.* at 768. *Pucci* is distinguishable

13

from this case.  The roles of the plaintiff in *Pucci* and Dr. Kyrkanides are markedly distinct in both scope of duties and subject matter attendant to the role.  A court administrator's role is relatively limited to the administration of the day-to-day functions of the courthouse.  A professor's role is far more robust; tenured professors are tasked with, among other things, educating students, conducting research, leading operationally, and contributing to the institution's governance.  The subject matter of Dr. Kyrkanides's speech at the January 2021 meeting, though idiosyncratic and self-centered, was plainly within the scope of and concerned his employee duties and Division operations.  He spoke to the Division-only sub-audience about clinic availability and responsibilities, computer or training access, compensation and compensation rights, and his views regarding Division leadership and improperly singular treatment.  Every area surely falls within an employee's discussion of the subject of his employment duties and expectations.

The setting is also relevant.[4]  Dr. Kyrkanides was barred from attending the weekly Division of Orthodontics meetings.  These meetings are not open to the public and are primarily attended by faculty members as part of and as a function of the job.  Thus, the closed forum in which Dr. Kyrkanides chose to speak directly pertains to the functioning and operations of the Division, implicating his employee perspective rather than pertinent observations as a mere citizen.  Relatedly, the audience of his speech was only other College of Dentistry faculty, indicating employee speech.  "Speech to supervisors is more likely to be speech as a government agent as compared to speech to outside individuals."  *DeCrane*, 12 F.4th at 596.

---

[4] It is not dispositive, as Defendants argue.  This prong's analysis considers a variety of non-exhaustive factors, setting being one.  *See Handy-Clay*, 695 F.3d at 540.  Defendants' reply brief suggests this prong's categorical satisfaction by virtue of his position and the type of meeting at which he spoke.  This argument is misguided and would render the full second prong meaningless, as this analysis only applies to public employees.

Lastly, Defendants correctly note that the Academic Freedom Exception to *Garcetti* does not apply in this case.   Under this exception, "professors at public universities retain First Amendment protections at least when engaged in core academic functions such as teaching and scholarship." *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021).   Dr. Kyrkanides's statements concerned neither teaching qua teaching, nor scholarship; they concerned matters of scheduling, salary, and credentialing.   While these relate to his employment, they are not under the ambit of free expression in teaching or scholarship.

Therefore, the Court finds that Dr. Kyrkanides was speaking pursuant to his employee duties rather than as a private citizen, rendering his speech unprotected by the First Amendment.

### iii.   *Pickering* Balancing Test

If Dr. Kyrkanides spoke as a private citizen on a matter of public concern, his speech yet is protected only if his free speech interests outweigh the College's interest in efficient operations. *See Pickering*, 88 S. Ct. at 1734-35.   The Supreme Court articulated pertinent considerations in this inquiry: "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 107 S. Ct. 2891, 2899 (1987).   The disruptive nature of speech is considered in balancing the state's interest in effective and efficient operations against the speaker's free speech interests.   *See Farhat*, 370 F.3d at 593-94 (citing *Waters v. Churchill*, 114 S. Ct. 1878 (1994)).   Defendants bear the burden of justifying speech restrictions on legitimate grounds.   *See Rankin*, 170 S. Ct. at 2899.   A "reasonable likelihood of such [operational] disruption will suffice." *Fenico v. City of Philadelphia*, 70 F. 4th 151, 166 (3rd Cir. 2023).

15

Defendants argue that their interest in protecting a functioning working environment outweighs Dr. Kyrkanides's interest in attending, and disrupting, Divisional meetings. *See* DE 102 at 6. Dr. Kyrkanides counters that his conduct was "professional and collegial" and "respectful and appropriate," thereby supposedly placing a material fact in dispute precluding summary judgment. *See* DE 99 at 7; *see also* DE 99-1 ¶ 21. Dr. Kyrkanides's logic, stated differently, is if he was professional and collegial in the meetings, then there is no threat to the interests advanced by Defendants, and his interest in attending the meetings prevails over Defendants' claimed concerns.

The January zoom video plainly refutes Dr. Kyrkanides's characterization of the call. As noted earlier, he constantly interrupted and was imperious. He repeatedly was accusatory toward Dr. Kluemper and other staff, including a spontaneous confrontation of participant Beeman. He made veiled threats about a "group of peers" ultimately deciding about the propriety of his treatment, claiming the whole of the United States would learn of the conduct at the College. In terms of respect or professionalism, jabbing his finger angrily was out of bounds as was his temporary abrupt exit and his later, derisive and rhetorical characterizations of the College as acting "ridiculous" and (with sarcasm), "amazing." He presented as angry, scornful, implacable, keening, and resolute on grieving any and every perceived slight. That is what the video conveys.

Regardless of the characterization of Dr. Kyrkanides's behavior, there is no genuine dispute that he disrupted the meetings and the functions of the call. Dr. Kyrkanides unequivocally derailed the January call by diverting the topic of discussion to areas not germane to the agenda but rather focused on his own idiosyncratic plight. *See* DE 96-4; 96-5; DE 96-6.

Dr. Kyrkanides's remaining argument is unconvincing. He argues that, aside from Defendants' self-serving affidavits, there is no evidence of interference with duties, disharmony

16

among co-workers, impairment of discipline, or detrimental impact of loyalty and trust. *See* DE 99 at 7. He also notes the limited audience to the January 2021 meeting, though it is unclear to the Court in what way this affects the balancing analysis. *See id.* Federal Rule of Civil Procedure 56 permits the use of affidavits to support a summary judgment. FED. R. CIV. P. 56(c)(4). Dr. Kyrkanides does not argue that there is a deficiency with the affidavits rendering them invalid for consideration. The Sixth Circuit held that it is improper to disregard evidence "merely because it serves the interests of the party introducing it." *See Harris v. J. B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010). Dr. Okeson stated in his affidavit that he received reports of Dr. Kyrkanides's intimidating and concerning conduct. *See* DE 96-3 ¶ 21. Dr. Kluemper provides numerous accounts of faculty/staff reactions indicative of disruption, disharmony and intimidation. *See* DE 96-4 ¶¶ 8-15. This bolsters that, post-call, Kluemper heard about concrete instances of faculty reactions to Kyrkanides's behavior on and relative to the zoom. In addition to this evidence, the video of the January 2021 meeting contains blatant instances of disharmony between Dr. Kyrkanides and other faculty. *See* DE 96-6. Dr. Kyrkanides denies he created disruption, but the evidence of record plainly provides an undisputed basis on which Kluemper determined to protect the Divisional function going forward by eliminating Dr. Kyrkanides from the weekly calls. In the Court's view, on the undisputed or self-evident parts of the record, the *Pickering* balance validates the call preclusion.[5] Kyrkanides had hijacked the call to import a series of claimed abuses, and that impropriety disrupted the call, impacted the open and collegial discussion, and threatened harm based on the reactions of fellow faculty. Kyrkanides's speech was not protected, but even if it were, the particular context is one where *Pickering* would allow the limited and protective response Dr. Kluemper imposed. Kyrkanides remained free to vent as he saw fit to all

---

[5] *Pickering* is for the Court, though there sometimes are informative underlying factual questions for a jury. *See Pucci*, 596 F. App'x at 470. Not so here, on the state of the record.

17

the same persons in every other context, and he remained free to attend general Dentistry faculty meetings and functions; Kluemper simply limited Kyrkanides from attending (and disrupting) the targeted administrative meetings of the Divisional sub-set within the College.   He had good reason and did not act contrary to Dr. Kyrkanides's rights.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Count I.

### b. First Amendment Retaliation

Count II of Dr. Kyrkanides's Amended Complaint alleges First Amendment retaliation. *See* DE 11 at 41.   To establish a cognizable First Amendment retaliation claim, Dr. Kyrkanides must prove facts showing:

> (1) that he was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of his constitutional rights.

*Nair v. Oakland Cnty. Comm. Mental Health Auth.*, 443 F.3d 469, 477-78 (6th Cir. 2006) (citing *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 715 (6th Cir. 2001)).

First, the Court rejects the laundry lists of alleged retaliatory actions, cobbled by Kyrkanides, with no citation for support in the record.   The Court will not run down and sort a slew of new theories introduced by way of a lawyer's cite-free summary.   The case centers on whether Defendant's actions within the limitations period evince triable retaliation, and that theory hinges, again, on the events of January 2021 and the ill-fated zoom call.

In part, this results from the chronology and in part from Kyrkanides's own characterizations.   Though Kyrkanides references a series of prior communications—including an April 2020 faculty call on which he was muted and third-party inquiries or complaints through much of 2020—any retaliation as to such communications would be untimely if occurring prior to October of 2020.   The adverse actions at issue in the record hinge on Kluemper's decision to bar

18

access to Division calls and on General Counsel Thro's alleged role in Kyrkanides not being timely credentialed. Kyrkanides himself characterized the free speech denial at issue as the preclusion from faculty meetings in January 2021, and he characterized the *basis* for that action as the taped "faculty/staff meeting" from the same time. *See* DE 96-9 (Healy email, saying taped zoom call is what "Kluemper . . . is basing his decision to take away my right of free speech" on). Further, it would make no logical sense for Kyrkanides's 2020 speech to have caused the 2021 meeting exclusion when he began 2021 *with* meeting access. Plainly, what occurred in January 2021 is what, legitimately or not, prompted Dr. Kluemper to bar Dr. Kyrkanides from further Divisional meetings.

Thus, Dr. Kyrkanides alleges Defendants Kluemper and Okeson retaliated against him by barring him from attending orthodontic faculty and staff meetings. *See* DE 99 at 13. Having concluded in Section a., *supra*, that Dr. Kyrkanides was not engaged in constitutionally protected speech, he fails to meet the first prong as to those two Defendants, so summary judgment again is proper. *See Ryan v. Blackwell*, 979 F.3d 519, 527 (6th Cir. 2020) (noting because the Plaintiff's speech "was not a matter of public concern and therefore not protected, we need not move on to the second two elements of a retaliation claim"). Again, although Kyrkanides has his own call interpretation, the record inarguably supports that Plaintiff was confrontational, peremptory, accusatory, angry, importunate, referenced threats of litigation, and repeatedly cast himself as targeted and mistreated on all fronts. Kluemper averred (*see* DE 96-4 ¶¶ 8-16) an ensuing series of reactions from and impacts on the faculty. And while Kyrkanides denies he did anything wrong, he does not meet the proof of faculty disruption and unease with any competent proof of his own. His January zoom conduct was not protected, because of the speech context (public employee nexus), the speech content (matters of conclusively private concern to Kyrkanides), and the

19

*Pickering* balance (that the confirmed and reasonably anticipated disruption outweighed Kyrkanides's marginal interest in making the speech). Shutting him down for the zoom activity is not actionable retaliation for a cascade of reasons.

Dr. Kyrkanides further alleges that Defendant Thro retaliated against him by interfering with his credentialling, which restricted his ability to engage in clinical activities and earn supplemental income. He claims this retaliation was motivated by Dr. Kyrkanides's protected speech. *See* DE 11 at 43. The adverse action Dr. Kyrkanides specifically alleges is that Defendant Thro told the Credentialing Committee not to communicate with him in February 2021, effectively that such communication must occur between counsel. *See* DE 99 at 15; DE 99-16.

First, Dr. Kyrkanides does not identify the protected speech that allegedly motivated Thro to retaliate. That leaves an elemental lacuna. As to the claimed adverse action (communications interference on credentialing), Kyrkanides avers that Thro blocked the Committee from direct communication in response to Kyrkanides's status inquiry. That nugget is in Kyrkanides's affidavit, but Kyrkanides himself would not be able to provide such proof, given at least the double hearsay and absence of personal knowledge. DE 99-1 at 2 ¶ 11. Another gap thus exists.[6]

While not conceding the first or third elements, Defendants argue that Dr. Kyrkanides's retaliation claim fails against Defendant Thro primarily because no adverse action happened. As grounds, Defendants cite Mr. Thro's June 14, 2021, email to Dr. Kyrkanides, via counsel, where Thro offered to assist Dr. Kyrkanides in completing the credentialing process, allowing him to engage in clinical activities and earn supplemental income. *See* DE 96-11 at 7 ("If your client wishes to complete the process, please tell me and I will ensure that you have the necessary forms

---

[6] For his part, Thro denies any such act, though he does contend that Kyrkanides had been unprofessional with credentialing staff. Thro agrees that he later stepped in to manage the communications directly. DE 96-2 ¶ 17.

20

and guidance for the necessary steps."). In a later June email, Defendant Thro provided Dr. Kyrkanides with detailed, step-by-step instructions on how to complete the credentialing process. *See* DE 96-12. By counsel, Kyrkanides did not object to this interaction and indeed discussed the schedules and prospective path in a collegial manner. *See* DE 96-11 (Plaintiff's counsel noting Plaintiff's travel and agreeing "Dr. Kyrkanides will have to wait until he return[s] to complete the credentialing process").

The adverse action must be one that would "chill or silence a 'person of ordinary firmness' from future First Amendment activities" to satisfy this element. *See Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021) (citing *Ctr. For Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007)). In the employment context, "adverse action" often includes actions like "discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *See Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (collecting cases). Those actions that create "only de minimis negative consequences" do not give rise to a cognizable retaliation claim. *See Kubala*, 984 F.3d at 1139. While the adverse-action inquiry is normally a factual one entrusted to the jury, official action that is inconsequential need not be submitted to the jury. *Josephson v. Ganzel*, 115 F.4th 771, 787 (6th Cir. 2024).

On the record before it, the Court finds no triable issue on the adverse action allegedly taken by Defendant Thro in February 2021. Any impact on credentialing (an issue that had lingered from early 2020 on), via simply different communication routing, was inconsequential or de minimis. As to the credentialing argument, it is manifest that Defendant Thro sought to be a resource to Dr. Kyrkanides in the completion of his credentialing, not an impediment as Dr. Kyrkanides alleges. Defendant Thro committed no adverse action in this regard. Further, Dr. Kyrkanides does not provide caselaw supporting his contention that the indirect communication

21

mandate imposed on him constitutes cognizable adverse action. On the contrary, the adverse action contemplated by the Sixth Circuit, detailed above, is far more detrimental than being required to go through particular communication channels for a specific context.[7] Indeed, Kyrkanides had sued the University and regularly was at odds with or complaining against broad facets of the College of Dentistry. For Thro to route communication between lawyers regarding an allegedly key outstanding process, credentialing, would not and did not crimp Kyrkanides's ardor for speech or rights pursuit as a rational matter. And again, the Court refuses to process other factual allegations unadorned with record citations.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Count II.

### c. Unconstitutional Conditions

Count III of Dr. Kyrkanides's Amended Complaint alleges that Defendants violated the Unconstitutional Conditions Doctrine. *See* DE 11 at 43. In the employment context, the doctrine prohibits the government from coercing employees into surrendering their constitutional rights. *See Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911-912 (6th Cir. 2019). However, a "condition cannot be unconstitutional if it could be constitutionally imposed." *See Rumsfeld v. Forum for Acad. and Institutional Rights, Inc.*, 547 U.S. 47, 58 (2006). In the Court's prior Memorandum Opinion and Order, Judge Van Tatenhove noted that the survival of Count III turns on whether the Plaintiff's ability to attend and speak at faculty meetings is protected by the

---

[7] It also bears noting that the adverse action prong requires an injury that would "chill a person of ordinary firmness from *continuing* to engage in that activity." *See Nair*, 443 F.3d at 477-78 (emphasis added). As an important comparison, Thro had implemented a similar approach previously, back in July 2020 when credentialing was also an issue based on alleged required accommodations. *See* DE 99-16 at 2. Thereafter, Dr. Kyrkanides filed reports with the State Medicaid office, Humana, and the Kentucky State Board of Dentistry. *See* DE 99-7, DE 99-8, DE 99-9. He also spoke extensively at the January 2021 faculty meeting and sent follow-up emails on the same day. *See* DE 99-4; DE 11 at 27. By his own conduct, Plaintiff demonstrates that an action requiring particular communication via lawyers would hardly or reasonably chill the speech exercise of Dr. Kyrkanides.

22

First Amendment. *See* DE 10 at 17. Because the Court finds the activity not protected by the First Amendment, in the context of this case, it follows that the condition limiting Dr. Kyrkanides's ability to attend faculty meetings is not unconstitutional. Thus, the Court grants Defendants' Motion for Summary Judgment as to Count III.

### d. Due Process

Count IV of Dr. Kyrkanides's Amended Complaint alleges a Fourteenth Amendment Due Process violation. *See* DE 11 at 45. The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. The procedural component of the Due Process Clause guarantees that no significant deprivation of life, liberty, or property will occur until notice has been provided and the individual has a meaningful opportunity to be heard. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

To prevail on a procedural due process claim, the plaintiff must demonstrate: (1) a protected life, liberty, or property interest, (2) a deprivation of that interest, and (3) the deprivation occurred without adequate process. *See Fields v. Henry Cnty., Tenn.*, 701 F.3d 180, 185 (6th Cir. 2012). The Court's prior Memorandum Opinion and Order narrowed Dr. Kyrkanides's due process claim to include only alleged deprivation of Plaintiff's liberty or property interest in attending weekly faculty meetings. *See* DE 10 at 20-21; DE 21 at 15. Dr. Kyrkanides argues that "by punishing and removing rights from Plaintiff, without following the set forth protocol of the University, and without giving Plaintiff notice of the removal of his rights . . . Defendants have violated and are violating Plaintiff['s] right to due process of law under the Fourteenth Amendment." *See* DE 11 at ¶ 160.

"First Amendment rights may constitute a liberty interest under the Due Process Clause." *Jackson v. City of Columbus*, 194 F.3d 737, 749 (6th Cir. 1999).  However, because the Court determined Dr. Kyrkanides had no First Amendment right to attend the weekly faculty meeting, the first element of his due process claim fails.  "Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 579 (1972)).  As such, the Court grants Defendants' Motion for Summary Judgment as to Count IV.

### e.  Qualified Immunity

Defendants alternatively argue that summary judgment is proper because they are each entitled to qualified immunity.  *See* DE 96 at 14 (as to Drs. Kluemper and Okeson), 25 (as to Mr. Thro).  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damage insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982).  "Once the defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to demonstrate both that the challenged conduct violated a constitutional or statutory right, and that the right was so clearly established at the time of the conduct 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)).  Thus, Kyrkanides must show that (1) Defendants violated a constitutional right and (2) that right was clearly established.  *See McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016).  Courts have discretion to decide in which order to address the two-prong qualified immunity analysis.  *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

Of course, the Court has found no right violation. The second prong is satisfied if "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 107 S. Ct. 3034 (1987)) (cleaned up). Courts must eschew defining clearly established law at a "high level of generality" because "immunity protects all but the plainly incompetent or those who knowingly violate the law." *See Tlapanco v. Elges*, 969 F.3d 638, 649 (6th Cir. 2020) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)).

Drs. Kluemper and Okeson assert entitlement to qualified immunity for their act of banning Dr. Kyrkanides from Divisional meetings. They claim that because neither the Supreme Court nor the Sixth Circuit has addressed whether a faculty member has the constitutional right to attend faculty meetings, in a context similar to this one, the law cannot be clearly established. *See* DE 96 at 15. This argument overstates the mark, as there need not be a case directly on point. *See Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019). Instead, for a right to be clearly established, existing precedent must have placed the constitutional question beyond reasonable debate. *See id.* Kyrkanides asserts that a "long line of judicial precedent" and the SACPT report should have put Defendants on notice that his ban was unconstitutional. *See* DE 99 at 9-10.

However, none of the precedent cited clarifies the right as clearly established in this context. Kyrkanides cites several cases dealing with speech in the classroom context as supportive of his position. *See id.* at 8-9. For example, Kyrkanides cites *Hardy v. Jefferson Cmty. Coll.*, where the Sixth Circuit reaffirmed that classroom speech "is one of our most fundamental and established constitutional rights." 260 F.3d 671, 682 (6th Cir. 2001). Kyrkanides makes no attempt to explain how *Hardy* or the other classroom discussion precedent is applicable to this speech context, gave Defendants a "fair warning," or placed their action of banning Kyrkanides

25

from Divisional meetings constitutionally beyond debate.  After all, the interests meriting protection in the classroom setting, namely "(1) the students' interest in receiving informed opinion, (2) the professor's right to disseminate his own opinion, and (3) the public's interest in exposing our future leaders to different viewpoint[,]" *see Meriwether*, 992 F.3d at 507, are conceptually distinct from the efficiency and operational interests present with administrative meetings.  Nor does the SACPT report provide the notice Kyrkanides's burden demands.   That post-hoc report concerns whether the meeting bar violated Kyrkanides's academic privilege under University rules; it has no bearing on Kyrkanides's constitutional rights.  *See* DE 99-5.

Conversely, Defendants offer case law supportive of the proposition that Kyrkanides's speech interest was not clearly established, and the Court agrees.  Defendants discuss *Baar v. Jefferson Cnty. Bd. of Educ.*, which dealt with a public-school teacher, Baar, being banned from attending a local chemistry club's meetings.  476 F. App'x 621, 623-24 (6th Cir. 2012).  The Sixth Circuit held the district court correctly determined that "reasonably competent officials could disagree on whether Baar's interest in attending LACA meetings outweighed the school district's legitimate interests in prohibiting attendance" such that Defendants were entitled to qualified immunity.  *Id.* at 634.  Importantly, the district court in *Baar*, like Defendants here, focused on the "government's interest in efficiency" and "maintaining a school environment free of disruption and abuse."  *See Baar v. Jefferson Cnty. Bd. of Educ.*, 686 F. Supp. 2d 699, 710-11 (W.D. Ky. 2010).[8]  Similarly, in *Garvie v. Jackson*, the Sixth Circuit found qualified immunity appropriate

---

[8] The speech context of *Baar* is clearly distinguishable from this case in that *Baar* dealt with a chemistry teacher attending chemistry club meetings, implicating interests (like curriculum content and particulars of classroom/lab instruction) akin to a schoolteacher's interest in the free flow of ideas in the classroom, whereas this case deals with a university faculty member's interest in attending administrative meetings, an undoubtedly distinct context for protected speech purposes.

where competent university administrators "could reasonably have concluded" that the adverse action was not a First Amendment violation.  845 F.2d 647, 650-51 (6th Cir. 1988).

Even assuming Kyrkanides's right to attend Divisional meetings satisfied *Pickering* balancing and *DeCrane* (which it does not), competent university administrators could have reasonably concluded that such a ban did not infringe Kyrkanides's First Amendment rights.  *See id.*  Where the undisputed facts show a limited speech infringement following inarguably disruptive meeting behavior, as to this administrative context and circumstance, Plaintiff presents no precedent that places this constitutional issue beyond debate.  *See Cahoo*, 912 F.3d at 898.  Accordingly, it cannot be said that a "reasonable official would understand that what he is doing violates that right," so Defendants Okeson and Kluemper are entitled to qualified immunity.  *See Baynes*, 799 F.3d at 610.

Defendant Thro also contends qualified immunity entitles him to summary judgment, because he did not violate a constitutionally protected right that was "beyond debate."  *See* DE 96 at 25.  He argues that his instruction to communicate through counsel was reasonable given the extant adverse litigation and the numerous complaints lodged by Kyrkanides with the UK Internal Office of Institutional Equity and Equal Opportunity.  Thro contends that no precedent clearly establishes this instruction as adverse action.  *See id.*  Kyrkanides, who faces the burden of showing Thro is not entitled to qualified immunity, offers no response to this argument.  A plaintiff fails to address ripened qualified immunity at his peril.  This omission is fatal to Kyrkanides's claim against Thro.[9]  Thro, like Kluemper and Okeson, met his initial burden of "coming forward with facts to suggest [he was] acting within the scope of [his] discretionary authority."  *See Cockrun v.*

---

[9] As but one example for why this matters, Kyrkanides does not contest Thro's allegation that part of the reason for direct communication was Kyrkanides's treatment of credentialing staff.

27

*Berrien County, Mich.*, 101 F.4th 416, 419 (6th Cir. 2024).  Kyrkanides's lack of response to this defense necessarily fails to satisfy the applicable burden.  Accordingly, Thro is entitled to qualified immunity and, therefore, summary judgment.

## IV.    CONCLUSION

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendants' Motion for Summary Judgment (DE 96) is **GRANTED** in full;

2. Defendants' pending Motion in Limine (DE 106) is **DENIED** as moot;

3. This action is **STRICKEN** from the Court's active docket;

4. Plaintiff's claims against the Defendants are **DISMISSED WITH PREJUDICE**; and

5. The Court will enter a separate Judgment.

This the 18th day of March, 2026.

Signed By:
Robert E. Wier
United States District Judge